**EMERSON RADIO CORP., Plaintiff,**

v.

**ORION SALES, INC., et al., Defendants.**

No. Civ.A. 95–6455.

United States District Court, D. New Jersey.

Jan. 21, 2000.

---

Paul F. Carvelli, McCusker, Anselmi, Rosen, Carvelli & Walsh, Chatham, NJ, David L. Harris, Lowenstein Sandler, Roseland, NJ, for plaintiff.

Joseph J. Fleischman, Norris, McLaughlin & Marcus, Somerville, NJ, Barny J. Bendes, Jeffrey W. Herrmann, Vedder, Price, Kaufman & Kammholz, Livingston, NJ, Jeffrey H. Daichman, Kane Kessler, New York, NY, for defendants.

## OPINION

WOLIN, District Judge.

This matter has been opened before the Court upon the motion of defendants Orion Sales, Inc. ("Orion"), Otake Trading Co., Ltd. ("Otake"), Technos Development Limited (collectively the "Otake Companies"), Shigemasa Otake and John Richard Bond for partial summary judgment pursuant to Federal Rule of Civil Procedure 56. Defendants, some of which are parties to certain agreements with plaintiff Emerson Radio Corporation ("Emerson"), move for dismissal of Count Two of the Complaint, which alleges a breach of the duty of good faith and fair dealing implied in contracts under New Jersey law. The motion has been decided upon the written submissions of the parties, pursuant to Federal Rule of Civil Procedure 78. For the reasons set forth below, the motion will be granted and Count Two of the complaint will be dismissed with prejudice.

## BACKGROUND

Plaintiff Emerson Radio Corp. ("Emerson") has dealt in electric and electronic goods under its Emerson brand since the early 1900's. Emerson has not, however, manufactured the products it sells since 1994, and claims that its "Emerson" trademark is its primary business asset. Defendants Orion, Otake and Technos Development Limited (collectively the "Otake Companies") are in the business of manufacturing and importing electronic consumer goods under various brand names, including their own "Orion" brand. Defendant Shigemasa Otake is the principal of the Otake Companies and defendant John Richard Bond is a former Emerson executive now employed by Otake.

As set forth in various prior opinions of the Court in this matter, Emerson entered into a licensing agreement with Orion on

February 22, 1995. *See* Declaration of Jeffrey H. Daichman (the "Daichman Decl."), Exh. C (the "License Agreement"). In this agreement, Emerson granted Orion an exclusive, three-year license to use the Emerson trademark on specified video and television products ("Video Products") sold to Wal*Mart Stores, Inc. ("Wal Mart"). License Agreement ¶¶ 2.1, 3.1.

The License Agreement contains several notable features pertinent to this dispute. First, there was no minimum sales requirement to be met by Orion, nor any express provision that Orion use "best efforts" or "due diligence" in marketing or selling goods under the license. There was, however, a minimum annual royalty of $4 million to Emerson, with additional royalties based on net sales to the extent the sales-based royalty calculation exceeded $4 million. License Agreement ¶ 5.1. The Otake Companies were permitted to sell their own "Orion" brand video product to Wal Mart as well. License Agreement ¶ 8.1. Finally, goods returned from Wal Mart and repair of goods sold to Wal Mart were the responsibility of the licensee. License Agmt. ¶ 13.

On the same day, Emerson entered into a separate agreement with the Otake Companies, pursuant to which Otake agreed to supply Emerson-branded Video Products to Emerson for sale to parties other than Wal Mart. Decl. of Saburo Yamato ("Yamato Decl.") Exh. B (hereinafter the "Supply Agmt."). Terms were to be consistent with the parties' "customary order and acceptance procedures." Supply Agmt ¶ 2.1. Prices were to be equal to the lowest price Otake charged to any third party or to any affiliate of Otake. Supply Agmt. ¶ 2.2. Emerson orders were to get priori-

ty once Wal Mart orders were filled. Supply Agmt. ¶ 2.5.

The relationship of the parties long predates the License and Supply Agreements. The Otake Companies have supplied video products to Emerson for sale under the Emerson mark since the mid–1980's. Affidavit of Eugene I. Davis ("Davis Aff.") ¶ 6.[1] In 1992, Shigemasa Otake was involved in a struggle for control of Emerson, in which he was defeated by Emerson's current management, then known as the Fidenas group. *Id.* ¶ 9. At that time, Emerson learned that the Otake Companies had developed its own "Orion" brand for video products and Bond left Emerson to work for Otake. *Id.*

Subsequently, Emerson went through a bankruptcy proceeding, from which it emerged in 1994. In 1994, a dispute erupted between the parties concerning payment for goods received and volume rebates. It is clear that the February 1995 agreements that are the subject of this lawsuit were negotiated in the context of this dispute. *See id.* ¶ 10–11. In fact, the Supply Agreement itself required payments by Otake to Emerson of $10.2 million "in full and final settlement" of prior claims, and by Emerson to Orion of approximately $5.2 million for sums alleged to be due. Supply Agmt. ¶ 3.

The parties operated amicably under their contracts for only a matter of months. By June 1995, Emerson wrote to Mr. Otake complaining, *inter alia*, that prices under the Supply Agreement were too high. Davis Aff.Exh. T. A mediation in July 1995 failed. Daichman Decl.Exh. G (Jurick Dep. at 199–200). Emerson placed no orders for Video Products under the Supply Agreement after 1995. *Id.* Exh. H,

---

**1.** The following background facts regarding the history of Emerson's relationship with defendants are taken from Emerson's brief's in this action and from the Davis Affidavit, which was originally submitted in an action between the parties in the United States District Court for the Southern District of Indiana, and which plaintiffs have submitted here in its original form. It is not clear that

the Davis Affidavit is properly before the Court, although defendants have not objected and presumably any procedural irregularities could be cured. The accuracy of the information set forth here has been assumed for the purposes of this motion only. This historical recitation should not be construed as the finding of the Court in that regard.

¶¶ 7–10. Defendants claim that Emerson never paid for a substantial amount of product it received and that Emerson wrongfully rejected returns.

By December 1995, the dispute had ripened into litigation. The Otake Companies filed suit in the Southern District of Indiana. Emerson filed the instant suit. In this action, Emerson alleges—in count one—breach of both the License and Supply Agreements regarding acceptance of returns, pricing of Video Products, failure to permit inspection of records, and failure to exploit the licensed trademark. Count two, the subject of this motion, alleges breach of the implied covenant of good faith and fair dealing. Counts three through five allege various torts and conspiracy.

The scope of this action has already been narrowed by motion. This Court granted defendants' motion for partial summary judgment that there was no implied term of best efforts with respect to exploitation of the License Agreement. *Emerson Radio Corp. v. Orion Sales, Inc.*, 41 F.Supp.2d 547 (D.N.J.1999) (the "Best Efforts Opinion"). As the parties will be aware, that ruling was based on the ground that there could be no implication of a duty to use best efforts to market Emerson-branded Video Products where the licensee was required to pay a minimum royalty regardless of the level of sales. On January 11, 2000, the Court granted defendants motion for partial summary judgment dismissing all claims for breach of the Supply Agreement and Counts Three through Five in their entirety.

What remains are plaintiff's allegations of breach of the License Agreement (to the extent those allegations are not based upon an implied obligation to use best efforts to exploit the license), and Count Two: breach of the implied duty of good faith and fair dealing. It is to the latter of these that this Opinion is directed.

## LEGAL DISCUSSION

### The Summary Judgment Standard

This is the third summary judgment opinion the Court has issued in this case, and the second in the last month. The Court will not restate the law of summary judgment motions again here, but incorporates here the relevant discussions in the Court's prior opinions. The issue is whether plaintiff has shown that there is a genuine issue of material fact on each necessary element of its claim that defendants breached the duty of good faith and fair dealing implied in contracts under New Jersey law. Fed.R.Civ.P. 56. Sensitive to the necessarily inchoate nature of the issues presented by the good faith and fair dealing claim, the Court assures the parties that it has drawn all reasonable inferences in favor of the non-movant as required by the controlling precedent.

### The Duty of Good Faith and Fair Dealing

#### a. "Best Efforts" and Good Faith.

As will be seen below, the existence of the minimum royalty requirement in the License Agreement is an important factor in assessing the scope of defendants' obligation under the duty of good faith and fair dealing. Of course, the minimum royalty was also the dispositive fact in the Court's Best Efforts Opinion. As a threshold matter, therefore, the difference between an implied obligation to use best efforts and the implied duty of good faith and fair dealing must be discussed.

It is settled law that "[a]n implied best efforts obligation is distinct from an implied covenant of good faith performance and fair dealing." *Permanence Corp. v. Kennametal, Inc.*, 908 F.2d 98, 100 (6th Cir.1990). In fact, their nomenclature explains how they differ; as a matter of the diligence required, best efforts is a more rigorous obligation than good faith and fair dealing. 2 E. Allan Farnsworth, *Farnsworth on Contracts* § 7.17b at 336 & n. 17 (1990) (citing *inter alia Grossman v.*

*Lowell,* 703 F.Supp. 282 (S.D.N.Y.1989)). Yet, the two obligations differ in kind and not merely in quality. Good faith and fair dealing are a matter of "decency, fairness or reasonableness," *Restatement (Second) of Contracts* § 205, cmt. a, although good faith and fair dealing may impose a positive obligation to act.

In this case, the duty of good faith and fair dealing is broader than an implied duty to use best efforts in marketing Emerson Products to Wal Mart. The Supply Agreement, which has nothing to do with the amount of sales to Wal Mart, has its own implied duty of good faith. Even within the License Agreement, defendants assumed obligations separate from the amount of sales, as well as obligations that are incidental to but not logically a part of the amount of effort expended to promote Emerson-brand Video Products. However, narrowly with respect to the amount of effort required to promote sales to Wal Mart, the good faith and fair dealing is less exacting than best efforts. Here the question is: were defendants efforts "decent, fair and reasonable" rather that "best."

Of course, all of these elements—the Supply Agreement, other obligations not related to Wal Mart sales, and whatever remains of defendants' requirement to promote Emerson products at Wal Mart—must be considered together. The Court will not neglect to consider whether the record would support a finding that defendants breached the duty of good faith and fair dealing implied in the contractual relationship as a whole.

**b. Good Faith and Fair Dealing in New Jersey**

▮ This Court is increasingly confronted with claims in commercial disputes alleging breach of the covenant of good faith and fair dealing implied in contracts controlled by New Jersey law. The New Jersey Supreme Court stated the law in this area most recently in *Sons of Thun-*

*der, Inc. v. Borden, Inc.,* 148 N.J. 396, 420–25, 690 A.2d 575 (1997). In its classic substantive statement, the covenant mandates that " ' "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract" ' ". *Id.* at 420, 690 A.2d 575 (quoting *Palisades Props., Inc. v. Brunetti,* 44 N.J. 117, 130, 207 A.2d 522 (1965) (quoting 5 *Williston on Contracts* § 670 at 159–60 (3d ed.1961))). The implied covenant is an independent duty and may be breached even where there is no breach of the contract's express terms. *See id.* at 422–23, 690 A.2d 575; *Bak–A–Lum Corp. v. Alcoa Bldg. Prods., Inc.* 69 N.J. 123, 129–30, 351 A.2d 349 (1976).

Despite the frequency with which the implied covenant is invoked, articulating sufficiently clear standards to permit its application in the particular case remains difficult. The Restatement and the cases note a state of mind or malice-like element to breach of good faith and fair dealing, holding that the duty excludes activity that is unfair, not decent or reasonable, nor dishonest. *Restatement* § 205 cmt. a; *Sons of Thunder,* 148 N.J. at 423, 690 A.2d 575. The Uniform Commercial Code defines a merchant's good faith as "honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade." N.J.S.A. 12A:2–103(1)(b); *see also* N.J.S.A. 12A:1–201(19).[2] These definitions have been described as "enfeebled," however, E. Allen Farnsworth, *Good Faith Performance and Commercial Reasonableness Under the Uniform Commercial Code,* 30 U.Chi.L.Rev. 666, 674 (1963), and plainly they provide little assistance to the trial judge who must distinguish bad faith from mere sharp commercial practice.

Returning to Williston's "fruits of the contract" formulation helps to cure the vagueness that results from consideration of the required standard of conduct alone.

---

**2.** Neither party has argued that the U.C.C. applies nor that the U.C.C. rule of good faith is similar to New Jersey's common-law duty of good faith and fair dealing.

While its shortcomings will be addressed below, Williston's helpful insight is to focus on nature of the interest the complaining promisee claims has been injured. Simple lying, opportunism and economic coercion outside a contractual relationship, may or may not give rise to some type of legal claim, but cannot sound in breach of contract. It is only those interests created upon the formation of an agreement that a duty of good faith and fair dealing may be implied to protect. 2 *Farnsworth on Contracts, supra,* § 7.17 at 313. The required standard of probity in commercial dealing is necessarily clarified by first identifying what types of interests are sufficiently weighty to permit the implication of a contractual duty. The Court takes guidance from this truth in extracting from the New Jersey cases a standard sufficiently clear to be applied.

On its face, Williston's "fruits of the contract" contemplates the preservation of some benefit to be gained that forms the fundamental purpose of the contract for the injured party. This is illustrated by the familiar *Lucy, Lady Duff–Gordon* example, in which the duty to exploit a license is implied from the fact that the licensor would never have received her bargained-for consideration in the absence of exploitation and consequent royalty stream. *Wood v. Lucy, Lady Duff–Gordon,* 222 N.Y. 88, 118 N.E. 214 (1917). Other jurisdictions define the duty of good faith and fair dealing as operating to protect the reasonable expectations of one party where a contingency is solely within the power of the other. *Beraha v. Baxter Health Care Corp.,* 956 F.2d 1436, 1443 (7th Cir.1992); *see also Restatement (Second) of Contracts* § 205, cmt. a ("Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party").

The underpinning for this version of the implied duty of good faith and fair dealing is the same as for the "omitted term" doctrine discussed in this Court's previous January 11, 2000, Opinion in this matter. The law assumes that, when entering into a contact, each party believes that the other party will not thwart the objective of the agreement. *Palisades Props.,* 44 N.J. at 130, 207 A.2d 522 ("Where fairness and justice require, even though the parties to a contract have not expressed an intention in specific language, the courts may impose a constructive condition to accomplish such a result when it is apparent that it is necessarily involved in the contractual relationship."); *see Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting,* 908 F.2d 1351, 1357 (7th Cir.1990) (duty of good faith is contractual "gap filler") (Easterbrook, J.). Thus, the duty to act in good faith is an unspoken part of the parties' agreement, and the courts will impose specific obligations to act or to refrain from acting under the rubric of preserving the "efficacy" of the contract.

The New Jersey Supreme Court's opinion in *Onderdonk v. Presbyterian Homes,* 85 N.J. 171, 182, 425 A.2d 1057 (1981), is a classic example of this mode of analysis. Retirees made a substantial, non-refundable payment to move into a retirement home, with relatively modest monthly fees to be increased as "determined to be necessary." *Id.* at 177, 425 A.2d 1057. When the monthly fees increased three-fold, the residents asked for financial statements, which defendants refused. The Court wrote:

Arrangements embodied in a contract may be such that the parties have impliedly agreed to certain terms and conditions which have not been expressly stated in the written document. Some principles have been utilized to define those implications. Thus we have held that terms will be implied in a contract where the parties must have intended them because they are necessary to give business efficacy to the contract as written. Moreover, in every contract there is an implied covenant of good faith and fair dealing. As a corollary to that proposition it is certainly reasonable to

imply that neither party to a contract shall injure the right of the other to receive the fruits of the agreement.

*Id.* at 182, 425 A.2d 1057 (citations and internal quotations omitted).

In light of the importance of financial stability to the retirees and the obvious purpose of the monthly payment to meet ongoing expenses, the *Onderdonk* court found an implied duty to provide financial statements under the duty of good faith and fair dealing. *Id.* at 184–87, 425 A.2d 1057. Plainly, the "fruits of the contract" in *Onderdonk* were the fundamental benefits the retirees reasonably expected to receive and the defendants reasonably expected to grant in their bargain. These benefits lay comfortably within the contractual relationship of the parties and, in that sense, were internal to the contract. Earlier New Jersey cases are similar. *See, e.g., Palisades Props.*, 44 N.J. 117, 207 A.2d 522 (township-donee of land could not destroy purpose of scenic easement retained by donor by permitting development on property not bound by easement).

■ The rule and its premise, that the duty of good faith and fair dealing is implicitly agreed to by the parties, is further illustrated by its corollary. Where the parties have expressly addressed an issue in their contract, that expression trumps any contrary claim based upon the implied duty. *U&W Industrial Supply, Inc. v. Martin Marietta Alumina, Inc.*, 34 F.3d 180, 187 (3d Cir.1994) (V.I.law); *Kham & Nate's Shoes*, 908 F.2d at 1357. The courts routinely hold that "the 'function of the court is to enforce the [agreement] as written, not to write for the parties a different or a better contract.' " *Freedman Truck Center, Inc. v. General Motors Corp.*, 784 F.Supp. 167, 178 (D.N.J.1992) (quoting *Liqui–Box Corp. v. Estate of Elkman*, 238 N.J.Super. 588, 570 A.2d 472 (App.Div.), *certif. denied*, 122 N.J. 142, 584 A.2d 214 (1990)) (alteration in original).

Were *Onderdonk* and its forebears the sum of New Jersey Supreme Court precedent on the issue, the "fruits of the contract" could be confined to those expectational benefits or purposes of the contract so inherent or fundamental to the bargain of the parties that good faith requires they be protected as an implied term of the parties' understanding. This, however, is impossible to reconcile with other New Jersey Supreme Court opinions, including the famous *Bak–A–Lum Corp. v. Alcoa Bldg. Prods., Inc.* 69 N.J. 123, 351 A.2d 349 (1976). In *Bak–A–Lum*, defendant terminated plaintiff's exclusive distributorship of many years duration by granting a number of other dealerships the area. Defendant's representatives concealed from plaintiff that the other distributorships were contemplated, for fear of dampening plaintiff's enthusiasm for selling defendant's products. Meanwhile, shortly before the termination, plaintiff signed a lengthy lease and expanded its warehouse.

The New Jersey Supreme Court found an implied requirement of twenty months notice before termination, arising from the duty of good faith and fair dealing. *Id.* at 140. In *Bak–A–Lum*, however, the "fruits of the contract" plainly hung from some different theoretical branch. It was no part of the benefits of the contractual relationship whether or not plaintiff obligated itself to an extended lease, nor did plaintiff's investment implicate the purposes of the contract. From the factual discussion in the opinion, it appears that the lease and plaintiff's other investment were undertaken years after the exclusive distributorship was commenced, and thus they can have formed no part of the parties' implied understanding *ab initio*.

On the contrary, the *Bak–A–Lum* Court acted to protect plaintiff's investment in reliance on the continued exclusivity of its distributorship, not any "fruits" plaintiff expected to receive. Of course, reliance is a garden-variety element of contract damages, and presents no problem as a matter of contract doctrine. It is not, however, a part of the benefit a party hopes to receive nor inherent in the purpose of a contract.

The result is that the implied duty, already unmoored from the textual anchor of the contract, is likewise free to float outside the bargained-for exchange of consideration between the parties.

*Sons of Thunder, Inc. v. Borden, Inc.,* 148 N.J. 396, 690 A.2d 575 (1997), is the most recent chapter. *Sons of Thunder* involved an operator of clam harvesting vessels that contracted with the defendant Borden to supply claims to Borden's processing plant. The contract was terminable on sixty or ninety days notice. Promisee made a significant investment in vessels, including the installation of specialized equipment at Borden's request. The contract required Borden to purchase a minimum amount of clams. Of course, Borden did not meet the minimum. Moreover, key employees demanded kickbacks from plaintiff to purchase clams, minimum price guarantees were not honored, and Sons of Thunder vessels were sent to sea only in bad weather when harvests were less. Finally, Borden terminated the contract, complying with the notice requirements.

The court emphasized that the termination was not a part of its analysis. Consistent with what has been discussed above, the court held: "the implied covenant of good faith and fair dealing cannot override an express termination clause." 148 N.J. at 419, 690 A.2d 575. Stressing that only Borden's performance (and not the termination) was relevant, the court found sufficient evidence to support a finding that the implied covenant was breached. *Id.* at 424, 690 A.2d 575. The court specifically cited Borden's knowledge that plaintiff had relied upon the income from Borden to pay its lenders for the investment in the vessels and alluded to the personal guarantees Sons of Thunder's principals had given for the financing. *Id.*

The New Jersey Supreme Court's language in *Sons of Thunder* identifies plaintiff's expectation as the interest to be protected. *Id.* at 425, 690 A.2d 575 ("Because its conduct destroyed Sons of Thunder's reasonable expectations and right to receive the fruits of the contract, Borden ... breached the implied covenant of good faith found in New Jersey's common law."). On the facts, however, the implication of *Sons of Thunder* for the definition of the "fruits of the contract" concept under New Jersey law is more equivocal. On one hand, under New Jersey law, Borden's interference with plaintiff's income under the contract formed the foundation of the claim. On the other hand, the precariousness of plaintiff's financial position and consequent vulnerability to further demands was a result of its investment in reliance on the contract. Notwithstanding the language of the opinion, it is difficult to escape the conclusion that the *Sons of Thunder* court based its finding of liability for breach of the implied duty primarily upon the harm to plaintiff's reliance interest.

■ To summarize, where a plaintiff alleges frustration of its expectation or fundamental purpose in entering the contract, the question of what interest will be protected by the implied duty answers itself; the plaintiff's interest is internal to the understanding of the parties and good faith requires that the defendant not exercise such discretion as it may have under the literal terms of contract to thwart plaintiff's expectation or purpose. Thus, in *Onderdonk,* discussion of dishonesty and self-interest, so prominent in *Bak–A–Lum* and *Sons of Thunder,* is notable for its absence. In *Onderdonk,* the retirees' expectation interest defined the duty to be implied.

■ The task is more difficult where defendant's acts have interfered with an interest extrinsic to the parties bargain, such as plaintiff's acts in reliance on the contract. It may be that New Jersey law has not developed to the point where a clear rule to deal with this situation can be extracted from the precedents. Certain common features of the New Jersey cases

provide guideposts, however, that instruct the Court in this case.

First, each of the landmark cases involve reliance by the disappointed party that was substantial in light of that parties economic strength. In *Sons of Thunder*, 148 N.J. at 424, 690 A.2d 575, plaintiff's principal was financially ruined. *See also Bak–A–Lum*, 69 N.J. at 130, 351 A.2d 349 (distributor made substantial investment in expanding business in reliance on exclusive distributorship). Second, in each of the above-cited cases, there was a disparity in size and in bargaining power between the parties. Taken together, these two points illustrate a third proposition: that vulnerability of the disappointed party is a key factor in assessing the other party's compliance with the duty of good faith and fair dealing.

Dishonesty in a statement or omission is also a critical factor. On this ground, the *Sons of Thunder* Court expressly distinguished *Karl's Sales & Service, Inc. v. Gimbel Bros., Inc.*, 249 N.J.Super. 487, 592 A.2d 647 (App.Div.), *certif. denied*, 127 N.J. 548, 606 A.2d 362 (1991), which held that a party's motive is irrelevant when it exercises an express contractual right. "[I]n *Karl's Sales*, unlike [*Sons of Thunder* ] and *Bak–A–Lum*, there were no allegations of bad faith or dishonesty on the part of the terminating party." 148 N.J. at 423, 690 A.2d 575. At least where reliance has been impaired, as opposed to loss of a benefit conferred as part of the bargain, it appears that deception is an important indicator of breach of the duty of good faith.

### c. Good Faith and Fair Dealing in Licenses

The Court's research has not disclosed any New Jersey cases applying the implied duty of good faith and fair dealing in the context of an intellectual property license/supply relationship similar to the one at issue here. Important cases from other jurisdictions follow the contractual gap-filling, protection-of-fundamental-expectations mode of analysis.

"Best efforts" cases of the *Lucy, Lady Duff–Gordon* school turn largely on the need to provide mutuality of obligation in the agreement. *Permanence v. Kennametal*, 908 F.2d 98, 100 (6th Cir.1990). As previously noted by this Court, the existence of a minimum royalty provision seriously undermines the rationale of those cases. 41 F.Supp.2d at 551. A minimum royalty can be viewed either as an express assignment of risk of non-exploitation, or as liquidated damages in the event of non-exploitation. In either event, as the Fourth Circuit noted in analogous circumstances, "[m]inimum royalty provisions are the very earmarks of contracts of hazard." *Orlandi v. Goodell*, 760 F.2d 78, 81 (4th Cir.1985). If the parties attempted explicitly to address the issue of non-exploitation by providing a minimum royalty, then this will form an imposing barrier to a claim for breach based on the licensee's level of sales.

The closest case on-point may be *Beraha v. Baxter Health Care Corp.*, 956 F.2d 1436 (7th Cir.1992), previously cited here and in the Court's Best Efforts Opinion. *Beraha* involved a license for a new, undeveloped, medical device with a minimum royalty. The licensee never developed the device nor brought it to market, and the Court of Appeals found a triable issue whether the licensee had breached the implied covenant of good faith. The jury question was whether the licensee "reasonably exercised its discretion under the circumstances and in light of the reasonable expectations of the parties." The Seventh Circuit expressly contemplated, however, that the jury might find on the facts of that case that the licensee was free to do nothing.

Licensing cases that consider the duty of good faith owed to a licensor independent of the issue of royalties have focused on a duty not to destroy the value of the intellectual property. For example, the Ninth Circuit affirmed a ruling that a licensee

had implied duty to include the copyright symbol on copies made under the license, the lower court having noted that failure to do so would have destroyed the copyright under the current law. *County of Ventura v. Blackburn*, 362 F.2d 515, 518 (9th Cir. 1966). One notes that this holding protects licensor's reliance rather than its expectation; the preservation of the value of the copyright formed no part of the parties' prospective purpose nor hope of gain in the relationship.

Earlier cases found that the grantor of dramatic rights in a literary property had an implied duty not to harm the value of those rights by exploiting movie rights, even though the motion picture industry had not yet been invented when the original license was granted and the movie rights must, therefore, have been retained by the licensor. *E.g., Manners v. Morosco*, 252 U.S. 317, 40 S.Ct. 335, 64 L.Ed. 590 (1920). Justice Holmes held: " 'There is implied a negative covenant on the part of the [grantor] . . . not to use the ungranted portion of the copyright estate to the detriment, if not the destruction, of the licensees' estate.' " *Id.* at 328, 40 S.Ct. 335 (Holmes, J.) (quoting *Harper Bros. v. Klaw*, 232 F. 609, 613 (1916)) (alteration in original). Clearly, this principle would work in the other direction, too, to protect the licensor's reversion at the end of the license.

■ Harmonizing these cases with New Jersey's law on good faith and fair dealing leads to the conclusion that an act by a licensee in derogation of the interests of a licensor might constitute a violation of the implied duty, notwithstanding the existence of a minimum royalty. Where the minimum royalty has been paid, a theory of breach of good faith and fair dealing based on frustration of expectation or contractual purpose is problematic. Where some other, reliance-based interest of the licensor is impaired, the implied duty may intervene.

The New Jersey precedents teach, however, that some heightened showing of egregiousness and economic oppression would be required in such a case, *e.g.,* dishonesty, exploitation of a vulnerability or disparity of economic power, or destruction of some truly substantial investment or property interest. This is particularly so where the party allegedly in breach is exercising a right reserved to it by the express terms of the contract. The Court takes as its starting point that the contract controls and that the duty of good faith and fair dealing "does not imply a general duty of 'kindness' in performance, or of judicial oversight into whether a party had 'good cause' to act as it did." *Kham & Nate's Shoes No. 2*, 908 F.2d at 1357.

### Emerson's Relationship with Defendants

■ The record of this case does not rise to a level that would justify a finding of a breach of the covenant of good faith and fair dealing. Defendants did not defeat the fundamental purpose of the relationship. Emerson's expectation was not subverted. No reasonable finder of fact could find a destruction of any reliance interest of Emerson of like kind or quality as the New Jersey Supreme Court has found will justify imposing liability for the implied duty.

The central element of consideration Emerson received from defendants was cash. Emerson received a minimum royalty of $4 million per year over the three year contract. It received $10.2 million in settlement of past claims. It is not disputed (except for the possibility of set-offs) that defendants paid these amounts.

Emerson gained substantial commercial certainty as well. The record contains admissions from Emerson that it had been losing money importing and reselling video products on its own, Decl.Exh. C (Andriani Dep. at 56–57, 80), and on merchandise sold to Wal Mart in particular. Daichman Decl.Exh. D. Product returns, the record shows, were a drain on revenues of approximately $20 million. Daichmann Decl. Exh. D, Exh. G (Jurick Dep. at 116–19).

This entire record bespeaks the tough competition and narrow profit margins in this industry. It appears uncontested that Emerson traded a losing business for a guaranteed income stream free of liability for product returns. This element of Emerson's expectation interest should not be underestimated.

Commercial certainty was also an element of Emerson's expectations under the Supply Agreement, by providing Emerson with a stable source of Video Products. The Court has already held that Emerson has failed to establish a triable issue on whether defendants refused to supply Emerson, or whether Emerson was afforded the favorable pricing to which it was entitled. Emerson admits, moreover, that it never ordered any products under the Supply Agreement after 1995, Daichman Decl.Exh. H ¶ 7–10, or even requested prices. *Id.* ¶ 5. On the contrary, the record shows that Emerson found another, cheaper source of supply, Daichman Suppl. Decl. dated Oct. 20, 1999, Exh. D (Dep. of Plaintiff's Expert Witness) at 119, and any claim that defendants thwarted Emerson's expectation of a steady or less expensive source is correspondingly weakened.

Focusing on Emerson's charge that defendants' allegedly failed to market Emerson products to Wal Mart, the Court believes that this theory cannot be considered as part of a claim that defendants interfered with Emerson's fundamental expectation or purpose in the contract. With respect to Wal Mart sales, the "fruits of the contract," narrowly defined, were the guaranteed royalties and added security previously mentioned. Emerson received these.

The Court agrees, however, with *Beraha*, that failure to exploit a license may breach the duty of good faith and fair dealing, even where a minimum royalty is provided. *Beraha* is distinguishable on ground that the licensor bargained for the licensee to develop an untried medical technology as well as pay a minimum royalty. Here there was no ancillary expecta-

tion interest by Emerson, or at least not one that was frustrated by defendants. Defendants' alleged breach cannot, therefore, be considered a failure of contractual expectation or purpose with respect to Emerson. The breach of good faith and fair dealing flowing from the alleged failure to exploit the license must, if it exists, be based on harm to some reliance interest of Emerson.

In a trademark license, such an reliance-based injury might arise where a licensor failed to exploit a trademark to the point where it was considered legally abandoned. The Court finds this rationale inapplicable here, however. No suggestion has been raised that the strength of the Emerson Radio trademark has been destroyed or even materially impaired by any alleged act or omission of defendants. The licensed intellectual property in *Beraha* was a patent, with a finite term. Thus, any delay in development and exploitation worked greater harm in that case. The Emerson trademark, in contrast, is well-established and of unlimited duration. On the facts of record, there is no damage to the property actually licensed by Emerson sufficient to support its breach of good faith claim.

Emerson argues that it entrusted to defendants its business relationship with Wal Mart. On the facts presented, the Court rejects this argument. Upon commencement of the license, Emerson did not entrust its Video Products business relationship with Wal Mart; it ceased doing business with Wal Mart in those products. Entrusting a trademark and entrusting a business relationship are different. Emerson voluntarily withdrew from its relationship with Wal Mart for the duration of the license.

Defendants have argued forcefully that Wal Mart is an independent actor and that Wal Mart's purchasing decisions cannot be charged to them as a breach of their own good faith. No discovery from Wal Mart itself has been brought to the Court's at-

tention regarding why they may have preferred the Orion over the Emerson brand. In the absence of contrary evidence, the Court must presume that the amount of Emerson-branded Video Products purchased prior to the License Agreement was a function of Wal Mart's perception of the market power of the trademark, relative price and other purchasing factors. The record would not support a finding that these decisions were based on any good-will in the Emerson/Wal Mart relationship. Nor does the record reflect that, upon expiration of the license, the past activities of defendants inhibited Emerson in its own efforts to sell products to Wal Mart.

Thus, even assuming the truth of Emerson's contention that the Wal Mart's purchasing during the license term was affected by defendants' bad-faith efforts to minimize sales of Emerson branded products, it is not clear how this invaded any expectation or reliance interest of Emerson's sufficiently grave to justify implying a contrary obligation in the contract. Wal Mart's purchasing decisions are ultimately the province of Wal Mart. If, following the expiration of the license, Emerson's products are competitive, Emerson has failed to produce evidence that would support a finding that any act of defendants would prevent Wal Mart from buying them.

Thus the Court finds that, having regard solely for the harm allegedly suffered by Emerson, no claim of breach of the duty of good faith and fair dealing can be maintained. The Court will not, however, neglect to examine the conduct of defendants in deciding this question. Here too, the Court is careful to draw all reasonable inferences in favor of the non-movant plaintiff. Taking the circumstances and history of the parties' relationship as a whole, the Court finds that the record could not justify a finding that defendants acted so unreasonably, deceitfully, unfairly, or otherwise to amount to a breach of the duty of good faith and fair dealing.

The Court must begin with the point that the License Agreement permits defendants to sell its own Orion branded products to Wal Mart. Defendants argue that this provision amounts to an express grant of the right to sell as many of their own products and as few of Emerson's as defendants wished. Defendants cite *Karl's Sales,* 249 N.J.Super. 487, 592 A.2d 647, for the proposition that the implied duty of good faith can never trump an express term of the contract.

As noted above, under *Sons of Thunder,* defendants' argument goes too far as a matter of New Jersey law, and even an express right may not be exercised with "dishonest" intentions. 148 N.J. at 423, 690 A.2d 575. On the other hand, evidence of the parties express bargain in the allocation of risk and benefit obviously will inform any assessment of whether one party has exhibited "bad faith" when the other is harmed.

The analysis is further influenced by the nature of the parties and their common history. Emerson is plainly a very sophisticated party. Its expertise in licensing must be inferred from plaintiff's own claims that its primary business is exploiting the Emerson mark and the many decades it has been in business. *See United Jersey Bank v. Kensey,* 306 N.J.Super. 540 561, 704 A.2d 38 (App.Div.1997) (declining to impose obligation based upon implied duty of good faith and fair dealing where plaintiffs were "not neophytes" and there was no disparity of bargaining power or access to information), *certif. denied,* 153 N.J. 402, 709 A.2d 795 (1998). In addition, it is no hyperbole to state that the parties have been at "daggers drawn" since at least the disputes in 1994, and perhaps as long as Shigemasa Otake's attempt to seize control of Emerson. Indeed, $10.2 million of payments called for in the Supply Agreement was in settlement of past disputes.

Here Emerson licensed its trademark to its competitor and adversary for goods to be sold to an important, common customer.

Meanwhile, the license permitted that competitor to sell as many of its own, directly competing goods to that customer as it wished. If, as is argued, Emerson's underlying assumption was that defendants would consider themselves obligated vigorously to market Emerson products at the expense of their own, this arrangement was ill-conceived at best. Indeed, it violates basic licensing strategy and even common sense. In the context of the contentious history of the parties', to infer that Emerson entertained any such supposed assumption is patently unreasonable.

On the contrary, the facts lead inescapably to a contrary conclusion. Emerson itself cites the testimony of defendant Bond that the minimum royalty that was supposed to "keep [defendants] honest." Emerson Brief at 5–6 (quoting Bond Dep. at 138:2–3). Alternatively, the minimum royalty may be seen as pre-paid, liquidated damages in the event defendants failed to exploit the license. Clearly, Emerson did not rely on any good faith duty to exploit their mark, and they operated under no assumption that defendants would do so. Instead, they negotiated their remedy for non-exploitation, and they have already received it.

The choice lies between implying a promise to correct an apparent injustice in the contract, as against holding the parties to the bargain which they have made. The latter alternative has especial force where the bargain is the result of elaborate negotiations in which the parties are aided by counsel, and in such circumstances it is easier to assume that a failure to make provision in the agreement resulted not from ignorance of the problem, but from an agreement not to require it.

*HML Corp. v. General Foods Corp.,* 365 F.2d 77, 81 (3d Cir.1966) (N.Y.law). Although the Court has previously relied upon the existence of the minimum royalty to reject Emerson's implied best-efforts claim, the same fact is capable of guiding the disposition of the distinct issue of good faith and fair dealing.

Other signs of bad faith prominent in the jurisprudence of the New Jersey Supreme Court are conspicuously absent here. Certainly there is no plausible claim of special vulnerability on Emerson's part. Giving Emerson's claims the benefit of every possible inference, it is clear that Emerson was at all times free to buy video products elsewhere. In fact, Emerson did buy video products elsewhere, for less that defendants were selling them, within a year of the contract's effective date.

To the extent Emerson may be relying upon the past course of dealing between the parties to show that a deviation from this past practice would constitute a breach of the implied covenant, Emerson's own evidence undercuts this claim. The Supply Agreement was signed in February 1995. Emerson complains that in November 1994 delays by the Otake Companies in quoting prices violated the past course of dealing between the parties. Emerson's Supp. Brief at 6–7 (citing Raab Decl.Ex. A) (letter dated Nov. 16, 1994). Thus, under Emerson's own argument, the past practices of the parties had already been disrupted. Any claim of a violation of the implied covenant due to deviation from this alleged past practice is thus severely attenuated.

Nor is the Court swayed by Emerson's proffer of defendants' internal communications, which plaintiffs argue show nefarious intent. For example, that Shigemasa Otake may have referred to the Supply Agreement as a "mere scrap of paper," in 1996, Carvelli Decl.Exh. 25, is of limited significance when Emerson had ceased to place orders with defendants by that time. More basically, in the absence of a showing that plaintiffs were deprived of the "fruits of the contract" as broadly defined by the New Jersey Supreme Court, the several expressions of ill-will cited by Emerson do not adequately support its case.

The Court will not exalt the literal terms of the contract over all other considerations, nor contrary to the emphatic endorsement of the New Jersey Supreme Court of the implied duty of good faith and fair dealing. However, the Court is convinced of the wisdom of Learned Hand's observation that "[I]n commercial transactions it does not in the end promote justice to seek strained interpretations in aid of those who do not protect themselves." *James Baird Co. v. Gimbel Bros., Inc.*, 64 F.2d 344, 346 (2d Cir.1933). In light of the express terms of the parties' agreements, the history of the parties' relationship, the character and sophistication of the parties, the lack of any fundamental frustration of the purpose of the contract or destruction of a substantial reliance interest, the Court holds that no reasonable finder of fact could hold that defendants breached the duty of good faith and fair dealing implied in contracts under New Jersey law.

### CONCLUSION

For the reasons set forth above, defendants' motion for partial summary judgment is granted and Count Two of the complaint alleging a breach of the implied duty of good faith and fair dealing will be dismissed with prejudice.