33 N.J. Super. 167 (1954)
109 A.2d 689
HERMAN A. FENNING AND HENRY KERSHAW, T/A SPEEDJACK COMPANY, PLAINTIFFS-APPELLANTS,
v.
AMERICAN TYPE FOUNDERS, INC., A NEW JERSEY CORPORATION, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued November 8, 1954.
Decided November 19, 1954.
*169 Before Judges EASTWOOD, GOLDMANN and SCHETTINO.
Mr. Daniel G. Kasen argued the cause for plaintiffs-appellants (Messrs. Kasen, Schnitzer & Kasen, attorneys; Mr. Theodore W. Geiser, on the brief).
Mr. William H. Osborne, Jr., argued the cause for defendant-respondent (Messrs. Pitney, Hardin & Ward, attorneys).
The opinion of the court was delivered by SCHETTINO, J.S.C. (temporarily assigned).
Appeal is taken from a judgment of involuntary dismissal at the conclusion of plaintiffs' case.
Plaintiffs brought this action, charging breach of an exclusive license agreement involving a patented device called "Speed-Jack" and demanding the following relief: (a) a determination that defendant abandoned the sale of *170 the device, (b) possession of dies, molds and tools used in the manufacturing of the device, and (c) damages. Defendant's answer denied (1) that defendant abandoned the sale of the devices, (2) that defendant was obliged to exercise reasonable efforts and due diligence in the exploitation of the sale of the devices, (3) that defendant failed to discharge any such obligation, and (4) that defendant negligently failed to render the license agreement productive. Defendant after pretrial moved for summary judgment and the application was denied. The trial was held by a court without a jury.
It is "well settled that upon motions for dismissal * * * the court cannot weigh the evidence, but must take as true all evidence which supports the view of the party against whom the motions are made, and must give him the benefit of all legitimate inferences which are to be drawn therefrom in his favor." Visaggi v. Frank's Bar and Grill, Inc., 4 N.J. 93, 98 (1950); Peter W. Kero, Inc., v. Terminal Construction Corp., 6 N.J. 361, 370 (1951).
The facts are substantially as follows: On July 1, 1949 plaintiffs entered into a written agreement with defendant under the terms of which plaintiffs granted to defendant an exclusive license under two certain United States letters patent which permitted defendant to manufacture devices covered by the letters patent and to sell them to others, and further granted to defendant the exclusive use of the name "Speed-Jack." During the full life of the patents, unless otherwise terminated by provisions of the agreement, defendant agreed to pay plaintiffs royalties upon the direct or indirect sale of the devices covered by the patents. Under the agreement plaintiffs sold to defendant certain dies, molds, tools, customers' lists, literature, records, good will and other assets. Plaintiffs agreed not to compete directly or indirectly or cause others to compete in the manufacture, sale or use of devices. Defendant paid $10,001 cash and agreed to pay $1.50 royalty for each device manufactured and sold.
The license agreement contains under paragraph 9, entitled Termination, a sub-paragraph as follows:
*171 "(e) If during the terms of said license the sale of devices covered by said license shall be abandoned by American, unless such abandonment shall be caused by governmental restrictions, strikes, acts of God or other causes beyond the control of American, or if this agreement shall be terminated by Speed-Jack pursuant to sub-paragraph (a) or by American pursuant to sub-paragraph (b) of this paragraph, the dies, molds and tools purchased by American from Speed-Jack, or such of them as shall not have been scrapped, and all replacements thereof and other dies, molds, and special tools acquired by American exclusively for manufacture under this license shall be delivered by American to Speed-Jack f.o.b. Elizabeth, New Jersey in their then condition, and the fair value thereof shall be considered as an additional royalty paid by American in such case; and thereupon American shall no longer be entitled to use the name `Speed-Jack' and any good will acquired by American from Speed-Jack shall revert to Speed-Jack."
The agreement contains no express provision for payment of minimum royalties and refers to no minimum standard of performance. It further specifies that it contains the whole understanding of the parties, supersedes all previous oral or written representations and that no amendment would be effective unless in writing.
Plaintiffs' testimony and the legitimate inferences therefrom are as follows. There was a ready market for the Speed-Jack at the time the contract was signed and it was a device that had been on the market for five years, with the name "Speed-Jack" established in the trade. They had a previous agreement with another company to sell the product, which was terminated, apparently because of dissatisfaction with quality. Nevertheless that company's sales were at a reasonable level. The product had been off the market for a while and plaintiffs were anxious to get it back in sale and enjoy royalty returns, since the 17-year patent life of the device was running out. The defendant knew this. Before the agreement was executed defendant had made tests of the device and knew that production and sale were feasible. It had represented to plaintiffs that, with the proposed program it was undertaking and its large sales organization, the yield to plaintiffs would conservatively be $15,000 to $20,000 per annum.
*172 After the agreement was executed defendant began to manufacture a device called "Adjust-O-Matic" at a much higher price. Meanwhile, plaintiffs were turning over to defendant "hundreds" of names of potential customers, gleaned from a backlog of orders prior to July 1949, as well as letters of inquiry which went unanswered for periods, in some cases exceeding one year. Even when answered, defendant mentioned the licensed device only in a derogatory manner while praising its own device, "Adjust-O-Matic." Protests made by plaintiffs were met by assurances by defendant that "Speed-Jack" would be manufactured and marketed as promised in the contract. But since July 1949, when the exclusive license was granted, defendant never used the name "Speed-Jack" or manufactured it. In August of 1950 defendant stated it would not make the lower price "Speed-Jack" but would make only "Adjust-O-Matic" the higher priced item. Plaintiffs were receiving royalties on the sale of the "Adjust-O-Matic" and wrote expressing belief that both units could be marketed, but were informed that "Adjust-O-Matic" would take care of the market that formerly used the "Speed-Jack."
After extensive legal argument on the motion the trial court granted the motion "for the reason stated" by defendant's counsel. R.R. 4:42-2(b) provides in part that, if at end of plaintiff's case, defendant moves for a dismissal of the action and "If the court renders judgment on the merits against the plaintiff, the court shall make findings as provided in Rule 4:53-1." The latter rule provides in part:
"In every contested action tried upon the facts without a jury, the court shall find the facts specially and state separately its conclusions of law thereon and direct the entry of the appropriate judgment. * * * Upon review, new or amended findings of fact may be made, but due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses."
In view of the limited finding by the trial court we shall examine the entire record with the facts considered most strongly for the plaintiffs.

*173 I
Plaintiffs first argue that defendant abandoned the sale of the device under paragraph 9(e) quoted above and are therefore entitled to the dies, molds and tools for the manufacturing of the device and for a declaration that defendant shall thereupon have no further right to use the name "Speed-Jack" or any good will acquired under the agreement. It was contemplated and agreed that plaintiffs would turn over lists of customers, inquiries, and a backlog of orders, and this was done. All this could mean nothing less to the parties than that "Speed-Jack" would be sold. That was clearly plaintiffs' expectation and within their contemplation and defendant's failure to do so could be an abandonment of the contract under paragraph 9(e).
Defendant cannot justify its abandonment by stating it marketed an improved "Speed-Jack." While defendant may not have been obligated to use that name, plaintiffs could not. If defendant did not at least market a similar product which would carry on plaintiffs' good will, then plaintiffs would have suffered a real loss. Perhaps it was defendant's purpose to improve the pulley to use it in its own machines primarily, but to market it secondarily. However, this was not the intent which characterized the negotiations and the agreement, and the contract must be interpreted in this light. Defendant well knew plaintiffs were interested in marketing "Speed-Jack," and by making estimations of expectation it, too, agreed to this intent.
Defendant contends that it has not abandoned the sale of the device; that it immediately started and continued activity in developing, manufacturing, using and selling the device; that thereby it brought about a better product and steady sales leading to royalties for plaintiffs. Defendant admits that it never sold a device under the name of "Speed-Jack" but did use plaintiffs' device in the manufacture of a device based upon plaintiffs' patents. It never made a single piece under the name "Speed-Jack." Although defendant insists it put out and advertised an improved pulley called "Adjust-O-Matic," *174 no advertisement ever mentioned "Speed-Jack"; its alleged improved product was priced 2 to 2 1/2 times as much as "Speed-Jack"; defendant was very dilatory in answering inquiries and when answer was made, defendant did not recommend "Speed-Jack" but boosted "Adjust-O-Matic," sold its own product, solicited sales for it, answered inquiries and even paid royalties to plaintiffs based on its sales.
But a glance at the sales figures is illuminating. No sales were made until April 1950, although the contract was signed July 1, 1949. 327 pulleys were sold in 1950, 405 in 1951, 229 in 1952, and 113 in the first three-quarters of 1953, sales for those quarters being 50, 48 and 15 respectively. Defendant would not sell to distributors. It appears that it was really incorporating the item into its own presses, and nothing more.
The record raises the point whether the "devices" which were to be the subject of sale encompassed a device which was so different that defendant could sell it under a different name and for a price at least twice that of plaintiffs' "Speed-Jack." The record sustains plaintiffs' contention that the device to be sold was its "Speed-Jack" and not "Adjust-O-Matic," defendant's device. If that be the interpretation to place on the contract, then there would be abandonment, and the trial court could have so concluded and entered judgment for plaintiffs under the first count.

II
Plaintiffs' next argument is based on the second and third counts. It is asserted that an exclusive licensee of a patented device is obligated to exercise reasonable efforts and due diligence in the exploitation and sale of devices. Plaintiffs' argument is based on an implied obligation since the license agreement contains no express provision spelling out the duty but that "What is implied in an express contract is as much a part of it as what is expressed." Bishop on Contracts (2d ed.), sec. 241. It is plaintiffs' contention that defendant has *175 not exercised reasonable efforts or due diligence in the exploitation of device covered by the patent, even if "devices covered by the patent" would include "Adjust-O-Matic," the device developed and sold by defendant.
The theory supporting this implied duty is that the productiveness of the licensor's property having been placed solely within the control of the licensee, a covenant on its part will be implied to work the patent in good faith to make it produce royalty income to the licensor. In re Waterson, Berlin & Snyder Co. v. Irving Trust Co., 48 F.2d 704, 709 (2 Cir. 1931), the court said that in England and the United States:
"Where there has been a conveyance upon an agreement to pay the grantor sums of money based upon the earnings of property transferred, the courts have implied a covenant to render the subject-matter of the contract productive  if the property was a mine, a covenant to mine, quarry, or drill; if it consisted of a patent or copyright, a covenant to work the patent or copyright. [citing cases]
The difference between the English and American decisions lies in the fact that our courts have allowed rescission where there has been a failure on the part of the grantee or assignee to act in accordance with his obligation to render the property conveyed productive, while the English courts have refused to allow it except for fraud."
The principle is well established with respect to a wide variety of contracts in which the consideration for a grant of property lies wholly in the payment of sums of money based upon the earnings of property transferred. It has been applied in the case of such diverse transactions as the granting of the exclusive right to place the licensor's endorsement of approval on the dress designs of another, Wood v. Lucy, Lady Duff-Gordon, 222 N.Y. 88, 118 N.E. 214 (Ct. App. 1917); to quarry stone, Stoddard v. Illinois Improvement Ballast Co., 275 Ill. 199, 113 N.E. 913, 914 (Sup. Ct. 1916); to sink and operate oil wells, Harris v. Ohio Oil Co., 57 Ohio St. 118, 48 N.E. 502, 505 (Sup. Ct. 1897); to transport cargoes, Great Lakes & St. Lawrence Transp. Co. v. Scranton Coal Co., 239 F. 603, 606-607 (7 Cir., 1917); to mine gold, Pritchard v. McLeod, 205 F. 24, 28 (9 Cir., *176 1913); and to exploit a musical composition, In re Waterson, Berlin & Snyder case, supra. It has been held that such a contract includes an implied negative covenant that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract. Uproar Co. v. National Broadcasting Co., 81 F.2d 373, 377 (1 Cir., 1936), certiorari denied 298 U.S. 670, 56 S.Ct. 835, 80 L.Ed. 1393 (1936).
Should a covenant be implied? Judge Clark speaking in Parev Products Co., Inc. v. I. Rokeach & Sons, Inc., 124 F.2d 147, 149 (2 Cir., 1941) said:
"When we turn to the precedents we are met at once with the confusion of statement whether a covenant can be implied only if it was clearly `intended' by the parties, or whether such a covenant can rest on principles of equity. Expressions can be found which insist on `intention,' * * *; which seem to combine both a requirement of `intention' and of `equity and justice,' * * * and which by-pass `intention' and rely solely on equity."
The obligation in the instant case should be applied on purely equitable concepts grounded on policy considerations. As Judge Cardozo said in Wood v. Lucy, Lady Duff-Gordon, supra (222 N.Y., at pages 90-92, 118 N.E., at page 214):
"It is true that he does not promise in so many words that he will use reasonable efforts to place the defendant's indorsements and market her designs. We think, however, that such a promise is fairly to be implied. The law has outgrown its primitive stage of formalism when the precise word was the sovereign talisman, and every slip was fatal. * * * A promise may be lacking, and yet the whole writing may be `instinct with an obligation,' imperfectly expressed * * *. If that is so, there is a contract.
The implication of a promise here finds support in many circumstances. The defendant gave an exclusive privilege. * * * The acceptance of the exclusive agency was an assumption of its duties. * * * His promise to pay the defendant one-half of the profits and revenues resulting from the exclusive agency * * * was a promise to use reasonable efforts to bring profits and revenues into existence."
A duty arose here, aside from intention of the parties, based on fairness and public policy. To permit one to take another's *177 property under such circumstances and not place on him the duty of exercising due diligence is to sanction antisocial conduct which approaches illegality. For an excellent discussion of policy considerations as ground for implication see the opinion of Judge Frank in Beidler & Bookmyer Inc. v. Universal Ins. Co., 134 F.2d 828 (2 Cir., 1943).
Defendant cites three cases: (1) Parev Products Co. Inc. v. I. Rokeach & Sons, Inc., 36 F. Supp. 686 (D.C.E.D.N.Y. 1941); (2) Thomson Spot Welder Co. v. National Electric Welder Co., 260 F. 223 (D.C.N.D. Ohio, E.D. 1917); and (3) Tesra Co. v. Holland Furnace Co., 73 F.2d 553 (6 Cir., 1934), and distinguishes some of those cited by plaintiffs. We think the Parev Products Co. case supports plaintiffs. Although an injunction was denied, the trial court pointed out that if licensee did not manufacture a reasonable quantity and the failure to do so shown to be willful and deliberate, the licensor could bring an action to rescind or for money damages. We do not consider the Thomson Spot Welder Co. case in point. In the Tesra Co. case the court did not find any implied provision that the licensee would manufacture and sell a specific number of units, but found that the licensee had attempted in good faith to manufacture and sell the device, and that was all it was obligated to do under the contract.
Defendants cite 69 C.J.S., Patents, § 258(e), p. 798:
"In the absence of an agreement therefor, a licensee is not bound to use the patent of the licensor, but only to abide by the terms of the license in case he does use it."
Compare, however, 69 C.J.S., Patents, § 250(d), at page 778 which states:
"* * * in a case of an exclusive license there is an implied obligation reasonably to exploit and to refrain from competition * * *."
The cases cited therein support this proposition. The New Jersey courts are in accord with the Lady Duff-Gordon doctrine. Atlantic City v. Farmers Supply and Products Co., *178 96 N.J.L. 504, 508 (E. & A. 1921) and our recent case of Silverstein v. Dohoney, 32 N.J. Super. 357 (App. Div., October 13, 1954).
If fairness to the parties is to control, or if we presume the parties intended a fair contract where the evident purpose of the license was exploitation, an implied covenant of reasonable exploitation is essential. Though no minimum royalty is involved, this is not inconsistent with a duty to use reasonable diligence in exploitation. On the plaintiffs' testimony, and considering all the reasonable and logical inferences that might be drawn therefrom, the trial court could have concluded that defendant failed to exercise reasonable efforts and due diligence in the exploitation and sale of the devices under the exclusive license agreement, and plaintiffs were entitled to judgment under the second and third counts.
Reversed and remanded, costs to abide the outcome of the trial.