EMERSON RADIO CORP., Appellant

v.

ORION SALES, INC.; Otake Trading Co. Ltd.; Technos Development Limited; Shigemasa Otake; John Richard Bond

No. 00–1571.

United States Court of Appeals, Third Circuit.

Argued Nov. 16, 2000.

Filed: June 5, 2001.

David L. Harris (Argued), Lowenstein Sandler, Roseland, NJ, Paul F. Carvelli, Andrew E. Anselmi, McCusker, Anselmi, Rosen, Carvelli & Walsh, Chatham, NJ, for Appellant.

Barry J. Bendes (Argued), Jeffrey W. Herrmann, Jeffrey H. Daichman, Vedder, Price, Kaufman & Kammholz, New York, NY, for Appellees.

Before: SLOVITER, AMBRO, and GARTH, Circuit Judges.

## OPINION OF THE COURT

SLOVITER, Circuit Judge.

## I.

### STATEMENT OF THE CASE

Plaintiff Emerson Radio Corp., a Delaware corporation with its principal place of business in New Jersey, began manufacturing consumer electronic products in the early 1900s. Emerson had stopped manufacturing its own products by 1994, and, instead, now licenses other manufacturers to produce and distribute goods bearing Emerson's trademark, which it claims as its greatest business asset.

Defendants, the Otake companies, consist of a group of affiliated companies, Orion Sales, Inc., an Illinois corporation, Otake Trading Co. Ltd., a Japanese corporation, and Technos Development Limited, a Hong Kong corporation, which Emerson alleges are owned and/or controlled by Shigemasa Otake, a citizen of Japan. The Otake companies are in the business of manufacturing and supplying to distributors worldwide consumer electronic products under various brand names, including their own "Orion" brand.

On February 22, 1995, Emerson entered into a License Agreement with Orion pursuant to which Emerson granted Orion a three-year "exclusive ... non-transferable license to utilize and exploit" the Emerson trademark "in connection with the manufacturing, sale, marketing, and distribution" of certain specified video and television products under Emerson's trademark to Wal–Mart Stores, Inc., historically Emerson's largest customer. App. at 87. Emerson entered into a Supply Agreement with the Otake companies at the same time

pursuant to which the Otake companies agreed to supply video products to Emerson for sale under the Emerson trademark to parties other than Wal–Mart. Both the License Agreement and Supply Agreement were set to run from April 1, 1995 to March 31, 1998. The relationship between the parties has been contentious from its inception, even before the negotiation and signing of the License Agreement, but we will confine ourselves in the text of this opinion to the issues directly relating to this appeal.

On December 20, 1995, Emerson filed suit in the United States District Court for the District of New Jersey on the basis of diversity jurisdiction against the three Otake companies, Mr. Otake, and John Richard Bond, a citizen of Kansas. Bond is a former Emerson executive who was Emerson's primary contact with Wal–Mart and was thereafter hired by Mr. Otake. The complaint alleged breach of contract, breach of the implied covenant of good faith and fair dealing, unfair competition, tortious interference with contractual relations, and conspiracy to interfere with and harm plaintiff's business relations.

Following discovery, the District Court, in a series of three opinions, granted summary judgment to the defendants on all but one of the issues. See Emerson Radio Corp. v. Orion Sales, Inc., 41 F.Supp.2d 547 (D.N.J.1999) (hereafter "Emerson I"); Emerson Radio Corp. v. Orion Sales, Inc., 2000 WL 49361 (D.N.J.2000) (hereafter "Emerson II"); Emerson Radio Corp. v. Orion Sales, Inc., 80 F.Supp.2d 307 (D.N.J.2000) (hereafter "Emerson III"). The court permitted the jury to determine the remaining issue, which was the respective responsibility of Emerson and Orion for a three-month span of Emerson-brand product returns from Wal–Mart from June to August 1995. The jury found for Emerson in part and for Orion in part, and the

District Court offset Emerson's damage award by the amount the jury awarded to Orion.

Emerson timely appeals the District Court's grant of summary judgment in favor of the defendants on Emerson's claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and tortious interference. Emerson also appeals from the amount of damages in the District Court's final judgment. This court has jurisdiction pursuant to 28 U.S.C. § 1291.

## II.

## GRANT OF SUMMARY JUDGMENT

■ Summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, a court must draw all reasonable inferences from the underlying facts in the light most favorable to the non-moving party. See Battaglia v. McKendry, 233 F.3d 720, 722 (3d Cir.2000). We have plenary review over a district court's grant of summary judgment. See Pittston Co. Ultramar Am. Ltd. v. Allianz Ins. Co., 124 F.3d 508, 515 (3d Cir.1997). Similarly, we have plenary review over the District Court's interpretation of state law, see id., and in this case, it is undisputed that we must apply the substantive law of New Jersey.

### A.

### BREACH OF CONTRACT

Emerson's principal claim on appeal is that Orion breached its contractual obligation in the License Agreement to sell Emerson-brand video products to Wal–Mart. Emerson proffers two legal theories in support of its breach of contract

claim: one is based on the express language of the License Agreement; the other is based on an obligation implied in that contract. The theories as set forth on appeal are alternate routes to the same goal—an opportunity to present the breach of contract claim to a jury. The District Court rejected both as a matter of law and we consider each in turn.

### 1.

### Express Obligation to "Utilize and Exploit"

■ Emerson's claim that Orion breached the express contract is based on ¶ 2.1 of the License Agreement, which provides, "[Emerson] grants to [Orion] an exclusive ... nontransferable license *to utilize and exploit the Licensed Marks* solely upon and in connection with the manufacturing, sale, marketing, distribution and after sales service of the Goods [defined to include video cassette recorders, video cassette players, televisions, etc.]" to Wal–Mart. App. at 87 (emphasis added). Emerson contends that this provision in effect imposed on Orion an express contractual obligation to use "reasonable efforts" or "due diligence" in selling and marketing Emerson-brand products to Wal–Mart.[1]

Emerson alleges that rather than exploiting the Emerson trademark on the Emerson products, Orion had a plan to displace the Emerson-brand products in Wal–Mart stores with Orion-brand products. Emerson argues that sales records show that the sales of Emerson-brand goods in Wal–Mart stores markedly decreased during the period of the license, from 1995 to 1998, while sales of the Orion brand increased. Further, as evidence of

a secret Orion "bait and switch" intent to displace the Emerson brand, Emerson produced numerous Orion interoffice memoranda, including the following memorandum from Bond to Mr. Otake that read, *inter alia:*

> Therefore, my personal opinion is to not alert Emerson people to our intentions but to let them think we have decided to help them—actually we are just buying 1 and ½ years to be free of Emerson.

App. at 1503.

In awarding summary judgment to Orion on Emerson's breach of contract claim, the District Court did not consider whether this evidence raised a material issue of fact as to whether Orion breached its contract. Instead, the District Court construed the word "exploit" as used in the phrase "utilize and exploit" to be subject to two possible meanings. It stated that the term "exploit" "could as easily be interpreted as granting Orion authority to act in its own self-interest as imposing a duty to act in Emerson's best interests." *Emerson I,* 41 F.Supp.2d at 549. The meaning of the term "exploit" is, according to the District Court, "inconclusive." *Id.* at 550. The District Court therefore declined to "interpret the use of that word as the imposition of an express duty on the part of Orion to exert some minimum level of effort or performance under the license," *id.,* and, in a brief discussion, it rejected Emerson's claim that Orion had express sales obligations under the license.

■ It is hornbook law that if the relevant terms in a contract are ambiguous, the issue must go to a jury. *See, e.g., Sanford Inv. Co., Inc. v. Ahlstrom Mach. Holdings, Inc.,* 198 F.3d 415, 421 (3d Cir. 1999). The court can grant summary

---

**1.** In the District Court and in its briefs on appeal, Emerson appeared to make the argument that Orion had an express obligation to exercise its "best efforts." At oral argument,

Emerson clarified that it was only suggesting that Orion had an obligation to use "reasonable efforts" or "due diligence."

judgment on an issue of contract interpretation if the contractual language being interpreted "is subject to only one reasonable interpretation." *Arnold M. Diamond, Inc. v. Gulf Coast Trailing Co.*, 180 F.3d 518, 521 (3d Cir.1999). To state the converse, an agreement is ambiguous if it is "susceptible of more than one meaning." *Sumitomo Mach. Corp. of Am., Inc. v. AlliedSignal, Inc.*, 81 F.3d 328, 332 (3d Cir.1996) (quotation omitted). Therefore, if the District Court was correct in determining that "exploit" as used in the license was ambiguous, we must reverse its order granting summary judgment on this claim.

■ The determination whether a contract term is ambiguous is a question of law that requires a court to " 'hear the proffer of the parties and determine if there [are] objective indicia that, from the linguistic reference point of the parties, the terms of the contract are susceptible of different meanings.' " *Sheet Metal Workers, Local 19 v. 2300 Group, Inc.*, 949 F.2d 1274, 1284 (3d Cir.1991) (brackets in original) (quoting *Mellon Bank, N.A. v. Aetna Bus. Credit, Inc.*, 619 F.2d 1001, 1011 (3d Cir.1980)). We have stated that before we decide whether a contract is ambiguous, we must " 'consider the contract language, the meanings suggested by counsel, and the extrinsic evidence offered in support of each interpretation.' " *American Cyanamid Co. v. Fermenta Animal Health Co.*, 54 F.3d 177, 180–81 (3d Cir.1995) (quoting *Teamsters Indus. Employees Welfare Fund v. Rolls–Royce Motor Cars, Inc.*, 989 F.2d 132, 135 (3d Cir.1993)) (finding these "traditional rules of contract interpretation" consistent with New Jersey law). In this case, however, it is the word "exploit" as used in the grant of the license to "utilize and exploit" that the District Court found ambiguous and we focus on that issue.

Orion deprecates Emerson's argument that the meaning of the term "exploit" in the License Agreement should go to a jury because "exploit" has more than one dictionary meaning. Orion states that virtually every word in the English language has more than one dictionary definition, and that such reasoning would render every contract essentially ambiguous. We need not accept such an expansive view. After all, it was the District Court that found the word "exploit" inconclusive in this context. The court was not mistaken in recognizing that the verb "exploit" can be given a meaning consistent with each party's interpretation. *Webster's Third New International Dictionary* (7th ed. 1993) defines "exploit" as "to take advantage of," a meaning consistent with Emerson's interpretation, or as "to make use of meanly or unjustly for one's own advantage or profit[;] take undue advantage of," a meaning more consistent with Orion's proffered definition. On this basis alone, the term "exploit" appears ambiguous. Both Orion and Emerson argue that their interpretation of the "utilize and exploit" language finds support in other provisions of the License Agreement. We do not discuss them because we believe they are not dispositive.

Under the circumstances, Emerson has substantial basis to complain that the District Court usurped the jury's function by finding the phrase "utilize and exploit . . . in connection with the . . . sale" of Emerson-brand video products to Wal–Mart to be ambiguous but granting summary judgment without permitting the jury to resolve the ambiguity through, *inter alia*, extrinsic evidence.

Orion, however, argues as a fallback position that no reasonable jury could construe permission given to it to "exploit" to impose a duty on it. We note, however, that there is relevant case law discussing contractual obligations that suggests that

courts, including some applying New Jersey law, support Emerson's interpretation. For this purpose, we find instructive the discussions in both *Fenning v. American Type Founders,* 33 N.J.Super. 167, 109 A.2d 689 (1954), and *Bellows v. E.R. Squibb & Sons, Inc.,* 184 U.S.P.Q. 473 (N.D.Ill.1974), the only two relevant cases of which we are aware that apply New Jersey law, of the contractual use of the term "exploit" and the implied obligations that may derive from it under New Jersey law. Admittedly, neither case involves a license agreement in which the licensee is granted explicitly the right to "exploit" the licensor's product. Still, in *Fenning* the New Jersey court stated that "if we presume the parties intended a fair contract where the evident purpose of the license was exploitation, an implied covenant of reasonable exploitation is essential." 33 N.J.Super. at 178, 109 A.2d at 694. Importantly then, *Fenning* associates the purpose of exploitation with an obligation to use what appear to be "reasonable efforts."

Moreover, in *Bellows,* although the court did not find an implied obligation it used the term "exploit" interchangeably with the phrases "use due diligence to exploit" and "exercise reasonable efforts or due diligence in the exploitation of." 184 U.S.P.Q. at 474. Several other courts also have used the term "exploit" interchangeably with, or at least analogized it to, "reasonable efforts," "best efforts," or "due diligence," albeit usually in the context of implied obligations. *See Beraha v. Baxter Health Care Corp.,* 956 F.2d 1436, 1441 (7th Cir.1992) (equating an "implied obligation to exploit" with an "implied best efforts clause" when interpreting Illinois law); *Permanence Corp. v. Kennametal, Inc.,* 908 F.2d 98, 101, 102 (6th Cir.1990) (interchanging "implied covenant to use best efforts" with "implied covenant to exploit," and finding no "implied duty to use

best efforts" under Pennsylvania law in part because licensee did not expressly agree to "exploit" the subject of the license); *Vacuum Concrete Corp. of Am. v. American Mach. & Foundry Co.,* 321 F.Supp. 771 (S.D.N.Y.1971) (using interchangeably the following terms under New York law: "obligation to exploit;" "covenant . . . to exploit . . . with reasonable diligence and in good faith;" "duty . . . to exploit . . . with due diligence;" "covenant to exploit with due diligence;" and "covenant . . . to exercise the alleged standard of diligence (whether it be termed 'best efforts,' 'due diligence,' or something along these lines) in the exploitation of"); *Havel v. Kelsey–Hayes Co.,* 445 N.Y.S.2d 333, 83 A.D.2d 380 (1981) (using interchangeably "obligation to exploit" with "promise . . . to use reasonable diligence to exploit" and "obligation to use due diligence to exploit" when interpreting New York law) (quotation omitted). In fact, even the District Court noted that courts have characterized an implied obligation under an exclusive license as "an implied 'covenant to exploit,' 'best efforts clause,' or 'due diligence requirement,' among other terms." *Emerson I,* 41 F.Supp.2d at 550.

In light of this precedent, we cannot hold, as did the District Court, that the contract language that granted Orion the right "to utilize and exploit" Emerson's trademarks did not, as a matter of law, impose on it an express obligation to sell a certain amount of Emerson-brand products to Wal–Mart. Thus, we will reverse the grant of summary judgment on Emerson's breach of contract claim insofar as it rejected Emerson's claim of an express obligation.

### 2.

### Implied Obligation to Use "Reasonable Efforts"

As noted above, Emerson argues that it is also entitled to a jury trial on its breach

of contract claim because, as a result of the License Agreement, Orion had an implied obligation to exercise "reasonable efforts" and "due diligence" in selling and marketing Emerson-brand products to Wal–Mart.[2] The District Court rejected as a matter of law Emerson's claim of any such implied contractual obligation. The court held that because the License Agreement required Orion to make a minimum annual royalty payment of $4 million for three years, Orion was not subject to any implied obligation to use "best efforts" to market and sell Emerson-brand products under the License. The District Court reasoned that "a required annual payment of this magnitude constitutes sufficient non-contingent consideration such that the equitable purposes served by inferring a best efforts clause are not implicated in this situation." *Id.* at 551. Emerson complains that it was error for the District Court to have determined that the inclusion of the minimum royalty provision precluded any implied obligation that Orion sell Emerson-brand video products to Wal–Mart during the license period. After consideration, we find the District Court's reasoning in this regard to be persuasive.

The doctrine of implied contractual obligations was first enunciated by Justice Cardozo in *Wood v. Lucy, Lady Duff–Gordon,* 222 N.Y. 88, 118 N.E. 214 (1917). The parties to that case had signed an agreement by which the defendant, who designed clothing and related accessories, gave plaintiff the exclusive right to place her indorsements on the designs of others, with the parties to share the profits equally. Plaintiff sued defendant for breaching the exclusivity provision, and defendant ar-

gued that the agreements lacked mutuality because plaintiff had not bound himself to any promise.

The court rejected that contention, holding that although plaintiff "does not promise in so many words that he will use reasonable efforts to place the defendant's indorsements and market her designs ... such a promise is fairly to be implied." *Id.* at 90–91, 118 N.E. at 214. Justice Cardozo was concerned that "[u]nless [licensee] gave his [reasonable] efforts, [licensor] could never get anything." *Id.* at 91, 118 N.E. at 214. As he explained, "[w]e are not to suppose that one party was to be placed at the mercy of the other." *Id.*

■ This doctrine, imposing on the licensee in an exclusive license an implied obligation "to use reasonable efforts to bring profits and revenues into existence," *id.* at 92, 118 N.E. at 215, has been adopted in many jurisdictions, including New Jersey. In *Fenning,* 33 N.J.Super. 167, 109 A.2d 689, the highest court of New Jersey to have considered the issue of implied obligations adopted the analysis as set forth in *Wood.* The *Fenning* plaintiffs, who had given defendant an exclusive license to manufacture and sell a patented device, sued claiming that defendant never manufactured or sold the device. In its answer, defendant denied it had any obligation to exercise reasonable efforts and due diligence to exploit the sale of the device. The trial court dismissed the action but the New Jersey appellate court reinstated it based on the implied obligation set forth in *Wood. See Fenning,* 33 N.J.Super. at 174–78, 109 A.2d at 692–94.

The New Jersey court stated: "The theory supporting this implied duty is that the productiveness of the licensor's property

---

**2.** As with its claim for an express obligation to "utilize and exploit" the license, Emerson here too has frequently referred to this implied obligation as an obligation to use "best

efforts." Still, we interpret Emerson's argument as suggesting an implied obligation to use "reasonable efforts" or "due diligence."

having been placed solely within the control of the licensee, a covenant on its part will be implied to work the patent in good faith to make it produce royalty income to the licensor." *Id.* at 175, 109 A.2d at 693. The court further stated: "The principle is well established with respect to a wide variety of contracts in which the consideration for a grant of property lies wholly in the payment of sums of money based upon the earnings of property transferred." *Id.* Accordingly, the court concluded that defendant had an implied obligation to "exercise reasonable efforts and due diligence in the exploitation and sale of the device under the exclusive license" notwithstanding the absence of any explicit language to that effect in the contract. *Id.* at 178, 109 A.2d at 694. As the court stated, "where the evident purpose of the license was exploitation, an implied covenant of reasonable exploitation is essential." *Id.*

The District Court in this case recognized that *Fenning* held that plaintiffs were entitled to trial on their claim that defendant failed to exercise reasonable efforts and due diligence. Nonetheless, the District Court distinguished *Fenning* because it involved an exclusive license that contained no minimum royalty provisions whereas the Emerson–Orion license did contain "substantial non-contingent consideration, which provides the licensor with some assurance of benefit arising from the license independent of the efforts of the licensee." *Emerson I,* 41 F.Supp.2d at 551.

The District Court noted that the *Fenning* court, "[i]n a perplexing aside," stated "without further explanation: '[t]hough no minimum royalty is involved, this is not inconsistent with a duty to use reasonable diligence in exploitation.'" *Id.* at 551 n. 3 (quoting *Fenning,* 33 N.J.Super. at 178, 109 A.2d at 694). If, as the District Court suggested, this meant that a duty to use

reasonable diligence would always be implied when minimum royalties were required, we agree with the District Court that such a comment is "counterintuitive." *Id.* We have no reason to believe, in light of the analysis of this issue in cases much more recent than the 1954 *Fenning* decision, that the New Jersey Supreme Court would so hold.

The only other relevant decision applying New Jersey law, albeit from a federal district court, is of little help. In *Bellows,* 184 U.S.P.Q. 473, where the parties chose New Jersey law to govern their contract, the court, in an abbreviated decision, declined to find that the licensee had an implied obligation to exercise reasonable efforts and due diligence to exploit the licensed patent device. The court noted that provisions in the license agreement explicitly recognized "that the parties considered and provided for the contingency that [the licensee] might either elect not to exploit [the device] or fail in the attempt." *Id.* at 474. One of those provisions gave the licensor the option to terminate the agreement should the licensee fail to pay a minimum royalty. The court read that and similar provisions as militating against the implication of an obligation to use due diligence to exploit the product in question. Although Emerson argues that *Bellows* stands for the proposition that the absence of an express provision contemplating nonuse of an exclusive license means that nonuse should be implicitly prohibited, we do not read *Bellows* as mandating such a holding in the converse of the situation presented there. In any event, we agree with the District Court that neither *Fenning* nor *Bellows* is directly applicable.

We find more instructive, as did the District Court, the decisions of the Sixth and Seventh Circuits in similar situations. In *Permanence Corp. v. Kennametal, Inc.,* 908 F.2d 98 (6th Cir.1990), Permanence,

which held a patent for a process to form an alloy, gave Kennametal a non-exclusive right to the patent. Kennametal, the licensee, agreed to pay Permanence a $150,000 fee and a royalty on the net sales price of the products it made using processes protected by the patent. It also paid advance royalties of $100,000. Kennametal thereafter exercised its option to convert the license to an exclusive one, for which it paid additional fees and advance royalties. Several years later, Permanence sued, claiming Kennametal breached the contract by failing to fulfill its implied obligation to use best efforts to exploit the license.

The Sixth Circuit declined to imply such an obligation into the exclusive license. Applying Pennsylvania law, the court determined that because of the provision in the contract for advance royalties the licensor "did not depend for its consideration *solely* on [licensee's] sale of products developed under the [license]." *Id.* at 102 (emphasis added). The court distinguished the facts before it from those in *Wood* where the court "found it necessary to imply a covenant to employ best efforts as a matter of law because otherwise the contract ... would [have] lack[ed] mutuality of obligation and [have] be[en] inequitable." *Id.* at 100. In contrast to *Wood,* Permanence had "protected himself against the possibility that the licensee will do nothing." *Id.* at 102.

Other courts have held similarly. For example, in *Beraha v. Baxter Health Care Corp.,* 956 F.2d 1436 (7th Cir.1992), the court, when faced with a comparable situation, adopted and applied the reasoning in *Permanence.* The court stated that "[w]hile courts have widely accepted the principle [of the *Wood* case], they do not lightly find implied obligations of any kind unless those implied obligations serve to effect the clear intentions of the parties

derived from the express terms of the contract." *Id.* at 1441–42.

A decision from this court in an analogous situation, although applying New York law, informs our analysis. In *HML Corp. v. General Foods Corp.,* 365 F.2d 77 (3d Cir.1966), we declined to extend the holding in *Wood* to a situation where the supplier received an advance minimum payment as part of the supply agreement. We described *Wood* and its progeny to mean that "[w]here an owner of a product gives an exclusive agency, *solely* in return for royalties, but no promise is expressed on the part of the agent to use his best efforts to promote it, the courts have implied such a promise." *Id.* at 80 (emphasis added). Because the terms of the contract at issue in *HML* provided for a "substantial minimum payment," and the supplier was therefore "not at the mercy of the [buyer]," this court found *Wood* inapplicable and the exercise of its equitable powers unnecessary. *Id.* at 81. In rejecting the appellant's claim for an implied obligation, we stated that in such instances:

> The choice lies between implying a promise to correct an apparent injustice in the contract, as against holding the parties to the bargain which they have made. The latter alternative has especial force where the bargain is the result of elaborate negotiations in which the parties are aided by counsel, and in such circumstances it is easier to assume that a failure to make provision in the agreement resulted not from ignorance of the problem, but from an agreement not to require it.

*Id.* There is no perceivable difference in this area of law between the jurisprudence of New York and the jurisprudence of New Jersey.

■ Accordingly, we will apply the reasoning of *HML* to the case at hand. The courts in *HML, Permanence,* and

*Beraha* did not blindly apply *Wood* to a situation involving an exclusive agreement and the payment of royalties but rather examined the mutual obligations and intentions of the contracting parties. They found that a substantial advance or minimum royalty payment serves to protect the licensor/supplier from the possibility of the failure of the licensee/buyer to use reasonable or best efforts, the concern in *Wood. See Beraha*, 956 F.2d at 1442; *Permanence*, 908 F.2d at 102; *HML*, 365 F.2d at 81; *see also Vacuum Concrete*, 321 F.Supp. at 773–74; *cf. Havel*, 445 N.Y.S.2d at 336, 83 A.D.2d at 383 (finding minimum royalty payment provision that "doesn't obligate defendant to the payment of minimum royalties" irrelevant, even where plaintiff's "recourse for defendant's failure to complete the annual minimum payment was to withdraw the license"). In such instances, there is mutuality of obligation and an implied obligation is unwarranted.

Paragraph 5.1 of the Emerson–Orion License Agreement provided Emerson with a substantial minimum royalty payment totaling $4 million per year for three years. The District Court found that this minimum royalty provision discharges the court of its duty to imply an obligation to use reasonable efforts because it ensures that Emerson has "some assurance of benefit arising from the license independent of the efforts of the licensee." *Emerson I*, 41 F.Supp.2d at 551. In his deposition, Geoffrey P. Jurick, Emerson's Chairman and Chief Executive Officer, acknowledged that the minimum guaranteed royalty provision was designed, in part, "to guard against the total nonuse of a license.... [I]t is one incentive that you expect the client, the licensee, will actually make use of a license because he is paying you, and

therefore, to keep things fair and even, he pays you to guard against—you assume that he will then do his best to keep your product on the shelf because he has to pay you." App. at 159.

Under the circumstances, we cannot hold that it is necessary to imply an obligation to use reasonable efforts in order to avoid the lack of mutuality that was Justice Cardozo's fundamental concern in *Wood.* Moreover, Emerson will have the opportunity at trial to press its contention that Orion expressly undertook the obligation to exploit and sell Emerson-brand video products to Wal–Mart by the language in the License Agreement.[3] We will therefore affirm the District Court's grant of summary judgment in favor of Orion on the question of an implied obligation to use reasonable efforts.

### B.

### BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

In addition to its breach of contract claim, Emerson included in its complaint a claim for breach of the implied covenant of good faith and fair dealing. The District Court dismissed this claim on summary judgment as a matter of law, relying upon "the express terms of the parties' agreements, the history of the parties' relationship, the character and sophistication of the parties, [and] the lack of any fundamental frustration of the purpose of the contract or destruction of a substantial reliance interest." *Emerson III*, 80 F.Supp.2d at 320.

■ An implied covenant of good faith and fair dealing is present in all contracts

---

**3.** The dissent also concludes that Emerson is entitled to show at trial that Orion failed to exercise reasonable efforts in selling and mar-keting the Emerson products, albeit on the additional theory that there was an implied obligation as well as an express undertaking.

governed by New Jersey law. *See Sons of Thunder, Inc. v. Borden, Inc.,* 148 N.J. 396, 420, 690 A.2d 575, 587 (1997). Good faith is defined in the Uniform Commercial Code, as adopted in New Jersey, as "honesty in fact in the conduct or transaction concerned." N.J. Stat. Ann. 12A:1–201(19). Although the UCC is inapplicable to the Emerson–Orion License Agreement, which was not a contract for the sale of goods, it is unlikely the concept of good faith would be defined differently by the New Jersey Supreme Court merely because the contract at issue is a license.

This obligation to perform contracts in good faith has been interpreted in New Jersey to mean that "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Sons of Thunder,* 148 N.J. at 420, 690 A.2d at 587 (quotations omitted). Under the contract at issue in *Sons of Thunder,* defendant Borden was to purchase clam meat from plaintiff for up to five years. The contract permitted Borden to terminate in a year but it was plaintiff's expectation that the contract would run for five years. Borden, with new managers, terminated the contract, plaintiff sued, and the jury found that Borden breached its obligation of good faith and fair dealing. The Appellate Division overturned the verdict. In reinstating the verdict, the New Jersey Supreme Court, while emphasizing the plaintiff's "desperate financial straits" and overall economic dependency on the defendant, determined there was sufficient evidence for the jury to have found that the implied covenant of good faith was breached because defendant's conduct "destroyed [plaintiff's] reasonable expectations and right to receive the fruits of the contract." *Id.* at 425, 690 A.2d at 589.

Other courts have similarly interpreted the implied covenant of good faith and fair dealing. *See Beraha,* 956 F.2d at 1444 (implied covenant requires that "a party vested with discretion ... exercise that discretion reasonably, with proper motive and in a manner consistent with the reasonable expectations of the parties") (emphasis omitted); *Comprehensive Care Corp. v. RehabCare Corp.,* 98 F.3d 1063, 1066 (8th Cir.1996) ("The implied covenant simply prohibits one party from depriv[ing] the other party of its expected benefits under the contract.") (quotation omitted) (brackets in original); Restatement (Second) of Contracts § 205, cmt. a ("Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party."). Under this authority, the inquiry looks to the reasonable expectations of the contracting parties.

New Jersey law also holds that a party to a contract can breach the implied duty of good faith even if that party abides by the express and unambiguous terms of that contract if that party "acts in bad faith or engages in some other form of inequitable conduct." *Black Horse Lane Assoc. v. Dow Chem. Corp.,* 228 F.3d 275, 288 (3d Cir.2000). In *Bak–A–Lum Corp. of Am. v. Alcoa Bldg. Prods., Inc.,* 69 N.J. 123, 130, 351 A.2d 349, 352 (1976), the New Jersey Supreme Court held that "defendant's selfish withholding from plaintiff of its intention seriously to impair its distributorship although knowing plaintiff was embarking on an investment substantially predicated upon its continuation constituted a breach of the implied covenant of dealing in good faith."

In reviewing the District Court's grant of summary judgment on this issue, we must address: (1) the "fruits of the contract" or interests that Emerson claims

have been injured by the defendants' alleged bad faith (the expectation interests); and (2) the manner in which the defendants carried out the express terms of the contract.

In its analysis of the "fruits of the contract," the District Court rejected Emerson's contention that the defendants' failure to market Emerson-brand products to Wal–Mart interfered with Emerson's fundamental expectation or purpose of the contract. *See Emerson III*, 80 F.Supp.2d at 317. Instead, the District Court stated that "[w]ith respect to Wal–Mart sales, the 'fruits of the contract,' narrowly defined, were the guaranteed royalties and added security that Emerson expected to receive from the License Agreement." *Id.* Emerson argues that the District Court's determination was not based on the evidence and, at the very least, its expectation interests concerning the License Agreement were disputed issues of material fact that should be decided by a jury at trial, and not by a judge on summary judgment.

Because Emerson was the party against which the summary judgment was brought, the District Court was required to draw all reasonable inferences in favor of Emerson. Emerson contended below that it was entrusting its business relationship with Wal–Mart to Orion with the purpose of protecting its primary asset, the "Emerson" name and goodwill, and that the minimum royalty payments provided for in the License Agreement constituted Emerson's *minimum* expectations. Defendant Bond acknowledged as much in his January 15, 1999 deposition, describing the $4 million per year as "[t]he minimum that [Emerson] expected in order to sign the license agreement." App. at 243. In contrast, the defendants argued in the District Court that Emerson was in desperate financial trouble and that it was simply looking "to transform a losing business into a profitable one," app. at 1250, expecting in return for the license only the $10.2 million that Orion undertook in the Supply Agreement to pay in settlement of past claims, Orion's assumption of responsibility for Wal–Mart returns, and a guaranteed minimum royalty payment of $4 million per year.

It appears that the District Court accepted the defendants' argument, concluding that "there was no ancillary expectation interest by Emerson, or at least not one that was frustrated by defendants." *Emerson III*, 80 F.Supp.2d at 317. Therefore, the District Court ruled that there could be no breach of good faith and fair dealing flowing from the alleged failure to exploit the license unless there was harm to some reliance interest of Emerson. *See id.* The District Court also rejected Emerson's argument that it had entrusted its business relationship with Wal–Mart to the defendants. The court distinguished between entrusting a trademark and entrusting a business relationship, and determined that "Emerson voluntarily withdrew from its relationship with Wal Mart for the duration of the license." *Id.*

In ruling on summary judgment, the District Court was limited to determining whether Emerson's contentions raised a genuine issue of material fact. When we draw all reasonable inferences in favor of Emerson, we conclude that the District Court erred in ruling that no such issues were raised. Emerson has put forth evidence to suggest that it expected much more than the $4 million annual minimum royalty payment. Emerson's Chairman and CEO, Jurick, stated in his deposition that "[w]e thought we might get six or $8 million a year. We actually did at one point figure we might get six and three-quarters to seven and a quarter million dollars a year. That was our vision at the time for this license." App. at 435. In this re-

spect, this case is like *Beraha,* the Seventh Circuit decision to which the District Court looked, where the court remanded the case so that the jury could hear the evidence and determine for itself "if [defendant] reasonably exercised its discretion under the circumstances and in light of the reasonable expectations of the parties." 956 F.2d at 1445. Here too, because we have conflicting evidence before us, we cannot sustain the grant of summary judgment on the ground that Emerson's expectation interests were not destroyed by the defendants' conduct.

Emerson further argues that it has shown a breach of the implied covenant of good faith and fair dealing because the defendants' concealment of their intentions caused it financial harm. This principle of New Jersey law was established in *Bak-A-Lum.* The District Court rejected this argument on several grounds. First, it disputed Emerson's evidence of damages, concluding that "[o]n the facts of record, there is no damage to the property actually licensed by Emerson sufficient to support its breach of good faith claim." *Emerson III,* 80 F.Supp.2d at 317. Second, the court found insufficient evidence of causation, noting that "Emerson has failed to produce evidence that would support a finding that any act of defendants would prevent Wal Mart from buying [Emerson products]." *Id.* at 318. Third, the court concluded that the evidence does not establish "that defendants acted so unreasonably, deceitfully, unfairly, or otherwise to amount to a breach of the duty of good faith and fair dealing." *Id.* And fourth, the District Court found significant Emerson's lack of "special vulnerability," a factor "prominent in the jurisprudence of the New Jersey Supreme Court." *Id.* at 319.

Again we conclude that the District Court failed to draw all reasonable inferences in favor of Emerson. Emerson has put forth considerable evidence suggesting that it suffered significant financial damage and that this damage resulted from the defendants' own intentional conduct. Sales of Emerson-brand products to Wal-Mart declined 78% in the first two years of the License Agreement, from $331 million to $74 million. In contrast, sales of Orion-brand products to Wal-Mart increased 160% in the first year of the agreement alone, from $92 million to $239 million.

Additional evidence suggests that this was exactly what the defendants intended when Orion entered into the License Agreement. In fact, one month into the license period, Takao Mizuta, an executive with the Otake companies, compiled a chart projecting that Orion sales to Wal-Mart would grow from $100 million in 1994 to $800 million in 1997 whereas Emerson sales to Wal-Mart would decrease from $340 million in 1994 to $0 in 1997.

Moreover, Emerson has submitted into evidence transcripts of phone conversations and written correspondence among Otake executives that further suggest a secret intent to decimate Emerson's relationship with Wal-Mart. App. at 1503 (Bond memorandum to Mr. Otake warning him "to not alert Emerson people to our intentions but to let them think we have decided to help them—actually we are just buying 1 and ½ years to be free of Emerson. . . . We have to pretend to Emerson that we are willing to help them."); App. at 1512 (Mizuta memorandum to Bond stating that "[i]n 1997, we will discontinue Emerson brand business completely."); App. at 1561 (Mr. Otake telephone statement that "[w]hen the contract with us ends [in March 1998], Emerson won't have anything.").

There is even evidence to suggest that defendants influenced Wal-Mart's purchasing decisions. App. at 1506 (Bond memorandum to Mr. Otake acknowledging

own ability to "greatly influence Wal–Mart's selections."); App. at 1560 (Memorandum from Jim Sweet, Bond's assistant, noting that "we have already convinced Wal–Mart to drop the Emerson 19″ CTV and carry the Orion 19″ in its place."). In light of all the evidence in the record, we conclude that Emerson has sufficiently established genuine issues of material fact as to damages, causation, and the defendants' secret, dishonest intent.

■ We further conclude the District Court placed undue emphasis on Emerson's alleged lack of economic vulnerability. Although the New Jersey Supreme Court in *Sons of Thunder* was particularly concerned with the plaintiff's vulnerability, the Court did not make that characteristic fundamental to a claim for breach of implied covenant of good faith and fair dealing. Instead, a complaining party's economic vulnerability is one factor among many to consider. Moreover, the District Court's conclusion that Emerson was not specially vulnerable may not prove correct; even the District Court pointed out that Emerson "had been losing money" and "[p]roduct returns ... were a drain on [Emerson's] revenues." *Emerson III*, 80 F.Supp.2d at 316.

For the reasons set forth, we will reverse the District Court's grant of summary judgment on Emerson's claim for breach of implied covenant of good faith and fair dealing.[4]

### C.

### TORTIOUS INTERFERENCE WITH CONTRACT

■ Emerson also argues that the District Court committed reversible error by dismissing on summary judgment its claim against Mr. Otake for tortious interference with the License and Supply Agreements. The District Court granted summary judgment because it found that Mr. Otake was not a third-party interloper to the contracts at issue, as required under the law. The court based its decision on Emerson's own repeated assertions that Mr. Otake was a corporate agent of Orion who "exercise[d] systematic control and decision-making authority over the Otake Companies' business and operations." App. at 624.

■ A cause of action for tortious interference with contract cannot be directed against a defendant who is a party to the contract. *See Printing Mart–Morristown v. Sharp Elecs. Corp.*, 116 N.J. 739, 752–53, 563 A.2d 31, 37–38 (1989). Although this rule extends to agents of a corporation, acts committed by an agent outside the scope of employment or agency may satisfy the "tripartite relationship" required for a tortious interference claim. *Silvestre v. Bell Atlantic Corp.*, 973 F.Supp. 475, 486 (D.N.J.1997), *aff'd*, 156 F.3d 1225 (3d Cir.1998).

Emerson's complaint alleged that Mr. Otake exercised control over the Otake companies, but at oral argument before us counsel for Emerson maintained that Mr. Otake is a legally independent third-party. Counsel stated that the allegations of the complaint proved inaccurate in light of subsequent discovery, and that the depositions make clear that Mr. Otake, although retired, continued to offer suggestions that

---

4. Emerson alleges in its complaint that the Otake companies, not just Orion, breached this implied covenant. The District Court treated the claim accordingly. In its briefs on appeal, Emerson only argues that Orion breached the implied covenant arising out of the License Agreement to which the other Otake companies (Otake Trading Co. Ltd. and Technos Development Limited) were not parties. On remand, the District Court can have the parties clarify this matter.

need not have been followed. Counsel conceded, however, that all of Mr. Otake's suggestions were followed.

Notwithstanding Emerson's assertions at oral argument, in its briefs before this court Emerson repeated its argument that Otake played a central role in Orion's business affairs during the relevant time period. *See* Br. of Appellant at 6, 13, 17–19. In fact, much of the bad faith conduct and intent that Emerson assigns to the Otake companies allegedly derives from Mr. Otake himself. *See id.* at 12–13, 17–19. Accordingly, we find no evidence to suggest that Mr. Otake's alleged conduct occurred outside the scope of his alleged control and ownership relationship with the Otake companies. Therefore, we will affirm the District Court's grant of summary judgment as to Emerson's claim for tortious interference.

### III.

### ENTRY OF FINAL JUDGMENT

Emerson also appeals from the judgment entered by the District Court on the lone issue that went to the jury, that pertaining to the parties' dispute relating to Emerson-brand products that Wal–Mart returned to the parties in July and August 1995. Emerson argues that the court improperly awarded duplicative damages and pre-judgment interest in Orion's favor.

### A.

### DUPLICATIVE DAMAGES

Under the License Agreement, Orion agreed to accept responsibility for certain returns from Wal–Mart of goods sold by Emerson before the License Agreement. There were three categories of returns: returns delivered and received in July

1995, which were Emerson's responsibility; returns delivered and received in August 1995, which were Orion's responsibility; and returns delivered in July and received in August, which were the subject of the dispute. The special interrogatories and the jury's responses in the verdict form were as follows:

1. With respect to the Wal–Mart returns sent by Wal–Mart to Emerson in July, 1995, and received by Emerson in August, 1995, check the appropriate box:
[ ] these were Emerson's responsibility, or
[x] these were Orion's responsibility.
2. What damages do you find, if any, in favor of:
Emerson Radio Corp. $ 873721.-

Orion Sales $ ——

3. In what year do you find that the obligation to Wal–Mart was satisfied:
[x] in 1995, or
[ ] in 1998.
4. Do you find that Wal–Mart charged Orion for returns sent to Orion in July, 1995?
 x Yes No

4(a) If your answer is "Yes," what amount is Orion due from Emerson?
 $ 215283

Verdict Form, February 24, 2000. Accordingly, the District Court entered judgment with respect to these two matters as follows: in Emerson's favor in the amount of $873,721 (plus pre-judgment interest) and in Orion's favor in the amount of $215,283 (plus pre-judgment interest).[5]

Emerson challenges the $215,283 figure. It argues that in fixing that amount the District Court gave Orion a duplicative credit. Emerson contends that the court failed to recognize that the jury's answer to Interrogatory # 2 constituted a "net" amount and that the jury's answer to Interrogatory # 4 was duplicative, not additional. There is no evidence in the record to support Emerson's assertions. The jury interrogatory sheet did not ask for a "net" figure in Interrogatory # 2. In fact, nothing in the verdict sheet supports Emerson's argument. Moreover, the pages in the appendix to which Emerson cites for

**5.** The final money judgment also included

other amounts that are not at issue here.

support offer no assistance.[6] In light of the lack of any evidence in the record to support Emerson's argument, we will affirm the District Court's entry of final judgment, as based upon the jury's answers to the court's special interrogatories.

## B.

### PRE–JUDGMENT INTEREST

 Emerson also argues that the District Court committed reversible error by arbitrarily awarding pre-judgment interest to Orion from July 15, 1995 on the $215,283 liability of Emerson. We review for abuse of discretion. *See Coastal Group, Inc. v. Dryvit Sys., Inc.*, 274 N.J.Super. 171, 181, 643 A.2d 649, 654 (App.Div.1994).

Emerson contends that Orion introduced no evidence demonstrating that pre-judgment interest was warranted and states that the July 15, 1995 date chosen by the District Court was "literally selected at random." Br. of Appellant at 57. In response, Orion argues that the award of pre-judgment interest properly derives from the jury's finding that Wal–Mart incorrectly shipped to and charged Orion for returns in July 1995 and that July 15, 1995 was appropriately chosen by the District Court because it was the midpoint of the period during which those incorrect charges were made against Orion for returns for which Emerson bore responsibility.

 Pre-judgment interest may be awarded to parties prevailing on contract claims at the discretion of the trial court "in accordance with equitable principles"

and we should only reverse the award of pre-judgment interest where "it represents a manifest denial of justice." *Coastal Group*, 274 N.J.Super. at 181, 643 A.2d at 654. We see no manifest denial of justice here as Orion's explanation is fairly supported by the record. Therefore we will affirm the District Court on this matter.

## IV.

### CONCLUSION

For the foregoing reasons, we will reverse the District Court's order granting summary judgment to the defendants on Emerson's claims for breach of contract based upon an express obligation to use reasonable efforts and for breach of the implied covenant of good faith and fair dealing, and we will remand for further proceedings consistent with this opinion. In all other respects, we will affirm the District Court's grant of summary judgment. We also will affirm the District Court's entry of judgment on the jury's verdict.

AMBRO, Circuit Judge, dissenting in part.

I write separately to join in the majority's well reasoned opinion in all aspects but one. I do not agree with the majority's conclusion in section II(A)(2) that the District Court correctly held that the License Agreement between Emerson and Orion did not contain an implied obligation to use reasonable efforts to sell and market Emerson-brand products. Therefore, I respectfully dissent from that portion of the majority's opinion.

6. In addition, Emerson's arithmetic is not correct. Emerson contends that the gross amount of damages in Interrogatory # 2 was $1,099,439 and that the jury had already deducted its answer to Interrogatory # 4 ($215,-283) from this total to get its answer to Interrogatory # 2 ($873,721). However, adding together the jury's answers to Interrogatories # 2 ($873,721) and # 4 ($215,283) only totals $1,089,004, thus leaving a $10,435 discrepancy.

Instead, I would hold that the District Court erred in finding as a matter of law that Orion had no obligation to use reasonable efforts and due diligence in selling and marketing Emerson-brand products to Wal–Mart because of the $4 million yearly minimum royalty payment. *See Fenning v. Am. Type Founders, Inc.*, 33 N.J.Super. 167, 109 A.2d 689, 694 (1954) (stating that a minimum royalty payment is not inconsistent with a finding of an implied obligation to use best efforts). Thus, I would conclude that Emerson is entitled to trial on its claim that Orion failed to exercise reasonable efforts in selling and marketing the Emerson products and that the District Court erred in granting summary judgment on that claim.