# DUNKIN' DONUTS INCORPORATED, Plaintiff,

v.

### Anand S. PATEL, Dipak R. Patel, Kelido, Inc., Anuja, Inc., and Kvell, Inc. Defendants.

No. 00–2493 (JAG).

United States District Court, D. New Jersey.

Oct. 31, 2001.

John J. Jacko, III, Buchanan Ingersoll, PC, Philadelphia, PA, Robert L. Zisk, David E. Worthen, Roland B. Ninomiya, Schmeltzer, Aptaker & Shepard, PC, Washington, DC, for Dunkin' Donuts.

Gerald A. Marks, Marks & Associates, Red Bank, NJ, for Defendants.

GREENAWAY, District Judge.

This matter having come before the Court on Plaintiff's motion for summary judgment on Counts I, II, and III of Plaintiff's Complaint; and the Honorable G. Donald Haneke, United States Magistrate Judge, having issued a Report and Recommendation, pursuant to Fed.R.Civ.P. 72(b) and L. Civ. R. 72.1(a)(2), recommending that Plaintiff's motion be granted; and said Report and Recommendation having been filed on September 18, 2001; and the time in which to object to the Report and Recommendation having expired; and no objection having been filed by either party; and it appearing that the recommended disposition of a dispositive motion such as a motion to remand is reviewed *de novo, see In re U.S. Healthcare,* 159 F.3d 142, 145–46 (3d Cir.1998); *Temptations, Inc. v. Wager,* 26 F.Supp.2d 740, 743 (D.N.J. 1998); *see also* Fed.R.Civ.P. 72(b); and this Court having conducted a *de novo* review of the parties' submissions and the Report and Recommendation; and good cause appearing,

IT IS on this 31st day of October, 2001,

ORDERED that the Report and Recommendation of Magistrate Judge Haneke is adopted as the opinion of this Court;

IT IS FURTHER ORDERED that Plaintiff's motion for summary judgment on Counts I, II, and III is GRANTED;

IT IS FURTHER ORDERED that a copy of this Order be served on all parties within seven (7) days of the date of this Order.

## REPORT AND RECOMMENDATION

HANEKE, United States Magistrate Judge.

Presently before the Court is Plaintiff's Motion for Summary Judgment on Counts

I, II, and III of the Complaint.[1] Also before this Court is Plaintiff's Motion to Strike the Certification and Memorandum of William James filed by Defendants in opposition to Plaintiff's Motion for Summary Judgment. These matters have been referred to me by the Honorable Joseph A. Greenaway, Jr. for an appropriate Report and Recommendation pursuant to Loc. Civ. R. 72.1(a)(2) and Fed.R.Civ.P. 72(b). I have considered all the papers. Oral argument has not been requested by counsel. For the reasons expressed below, I respectfully recommend that both the Motion for Summary Judgment and the Motion to Strike the Certification and Memorandum of William James be granted.

### Background

#### Motion for Summary Judgment

This is a Motion filed by the Plaintiff, Dunkin' Donuts Incorporated ("Dunkin'") seeking summary judgment on Counts I, II, and III of the Complaint. These counts allege that Defendants breached their respective Franchise Agreements with Plaintiff by violating Plaintiff's standards for health, sanitation, and safety as set forth in the Franchise Agreements between the parties. Subsequent to suit being filed, Defendants cured the violations that existed at their respective Dunkin' Donut shops. In that regard, Plaintiff now seeks payment of its attorneys' fees and costs under the terms of the Franchise Agreements which Plaintiff alleges Defendants have refused to pay.

#### a. *Statement of Material Facts as to which there is no genuine issue.*

Plaintiff is the franchiser of the Dunkin' Donuts franchise system. Dunkin' franchisees are licensed to operate under the Dunkin' Donuts systems, which involves the production, merchandising, and sale of doughnuts and related products using a specially designed building with special equipment, layouts, products, standards, and specifications.

Defendant, Anuja, Inc., is a Dunkin' Donut franchisee for a doughnut shop located at 752 Hamilton Street, Somerset, New Jersey (the "Hamilton Street Shop") pursuant to a franchise agreement dated June 1, 1998 (the "Hamilton Street Franchise Agreement").

Defendants, Anand S. Patel, Dipak R. Patel, and Kelido, Inc., are Dunkin' Donuts franchisees for a doughnut shop located at 30 Lafayette Avenue, Morristown, New Jersey (the "Lafayette Street Shop") pursuant to a franchise agreement dated October 12, 1989 (the "Lafayette Avenue Franchise Agreement").

Defendant, Kvell, Inc., is a Dunkin' Donuts franchisee for a doughnut shop located at 135 West Main Street, Somerville, New Jersey (the "West Main Street Shop") pursuant to a franchise agreement dated August 21, 1998 (the "West Main Street Franchise Agreement").

Plaintiff provides each of its franchisees a set of manuals and guidelines (the "Manuals") which set forth in detail the procedures, methodology, and standards applicable to the operation of a Dunkin' Donuts shop. These documents provide detailed and specific guidance and standards for shop maintenance and appearance; food preparation, presentation, and service; customer service standards; and cleanliness and sanitation.

---

1. Plaintiff has stated that should this motion be granted, it will dismiss the remaining counts of the Complaint, which allege trademark infringement and dilution, and unfair competition, and that this matter will be resolved in its entirety.

The Franchise Agreements between the parties contain language as well as acknowledgments and agreements by Defendants concerning the maintaining of Dunkin's standards for health, sanitation and safety. The applicable paragraphs of the Hamilton Street and West Main Street Franchise Agreements state:

5.0 FRANCHISEE understands and acknowledges that every detail of the Dunkin' Donuts System is important to DUNKIN' DONUTS, to FRANCHISEE and to other Dunkin' Donuts franchisees, in order to develop and maintain high and uniform standards of quality, cleanliness, appearance, service, facilities, products and techniques to increase the demand for Dunkin' Donuts products and to protect and enhance the reputation and goodwill of DUNKIN' DONUTS....

5.1 ... FRANCHISEE shall operate the Dunkin' Donuts Shop so as to maximize Gross Sales and maintain all standards of the Dunkin' Donuts system. In connection therewith, FRANCHISEE further agrees:

5.1.1 To use all materials, ingredients, supplies, papers goods, uniforms, fixtures, furnishings, signs, equipment, methods of exterior and interior design and construction and methods of product preparation and delivery prescribed by or which conform to DUNKIN' DONUTS' standards and specifications; and to carry out the business covered by this Agreement in accordance with the operational standards and specifications established by DUNKIN' DONUTS and set forth in DUNKIN' DONUTS' operating manuals and other documents as they presently exist or shall exist in the future or as may be otherwise disclosed to DUNKIN' DONUTS franchisees from time to time.

. . . .

5.1.6. To maintain, at all times and at FRANCHISEE'S expense, the interior and exterior of the Dunkin' Donuts Shop and all fixtures, furnishings, signs and equipment in the highest degree of cleanliness, orderliness, sanitation and repair, as reasonably required by DUNKIN' DONUTS.

The Lafayette Avenue Franchise Agreement contains provisions substantively identical to these provisions.

The Franchise Agreements provide also for a twenty-four hour cure period for any violation of Plaintiff's standards for health, sanitation, and safety.[2] The Franchise Agreements also specify that the Franchisee shall pay to Dunkin' all damages, costs, and expenses, including attorneys' fees, incurred by Dunkin' as a result of any breach of the Franchise Agreement by franchisee and for failure to cure after notice.[3]

On April 11, 2000, the Hamilton Street and Lafayette Avenue Shops were inspected by a Dunkin' representative. Numerous standards violations were identified relating to health, sanitation, and safety. Also on April 11, 2000, the same Dunkin'

2. The express provision in the Franchise Agreements states:
 A twenty-four (24) hour cure period shall apply to the violation of any law, regulation, order or DUNKIN' DONUTS standard relating to health, sanitation or safety ....

3. The Franchise Agreement provides:
 If FRANCHISEE fails to cure a default, following notice, within the applicable time period set forth ... [herein], FRANCHISEE shall pay to DUNKIN' DONUTS all damages, costs and expenses, including, without limitation, interest at eighteen percent (18%) per annum, or the highest permissible rate, and reasonable attorneys' fees incurred by DUNKIN' DONUTS as a result of any such default ....

representative hand-delivered to the Hamilton Street and Lafayette Shops notices to cure listing the violations and requesting that the deficiencies be cured immediately. On April 13, 2000, the Dunkin' representative reinspected these two shops and numerous standards violations remained uncured.[4]

On April 13, 2000, the West Main Street Shop was inspected by a Dunkin' representative. Several standards violations were identified relating to health, sanitation, and safety.[5] On the same day, the representative hand-delivered to the West Main Street Shop a notice to cure and requested that the deficiencies be cured immediately. On April 17, 2000, the Dunkin' representative re-visited the West Main Street Shop and found that some standards violations remained uncured.

On May 23, 2000, Plaintiff filed suit seeking to enjoin Defendants from violating Dunkin's standards at all three shops. On August 7, 2000, Plaintiff withdrew its motion for a preliminary injunction after additional inspections of the three shops, which were conducted after suit was started, revealed that Defendants had now cured the deficiencies identified in the April, 2000 inspections. However, despite the terms of the Franchise Agreements, Plaintiff alleges that Defendants have refused to pay Dunkin' the attorneys' fees and costs it has incurred in bringing and prosecuting this action. Plaintiff also contends that as a result of that refusal, it continues to incur fees and costs, including those associated with the present motions.

In their opposition papers to the summary judgment motion, Defendants assert that "Dunkin' began conducting a campaign of false and harassing alleged 'health and safety' inspections in April, 2000 which were designed to establish a record of poor operation which would ultimately be used as a basis for terminating all of Plaintiffs' [sic] franchises." Defendants assert they were "further victimized" by this action and that they were "unfairly accused of violating" Plaintiff's healthy and safety standards.

Defendants submitted with their opposition papers a Certification of William James, dated May 30, 2001, and a Memorandum from Mr. James to Defendants' counsel, dated June 26, 2000. In his Certification and Memorandum, Mr. James states that in his professional opinion as a New Jersey State Registered Environmental Health Specialist, Dunkin's inspections and findings were conducted by "non-qualified personnel" and were "inaccurate and based on critically flawed practice and procedure." Mr. James states further that in his "professional opinion, all three locations ... were all operating in compliance with New Jersey Law ... at the time they were allegedly 'inspected' for sanitary violations by Dunkin' Donuts' unqualified personnel. Based on a review of the reports, it could not be shown that they were not operating property [sic], *but I was not there at that time and cannot say that*

---

**4.** At the Hamilton Street Shop, the violations consisted of the walk-in freezer being littered with cornmeal and other debris; bagels being stored without proper covering; beverage lids being stored on dirty trays; employees not wearing hats; cleaning products being placed next to food items; the men's restroom sink being dirty; and the premises being generally unclean. At the Lafayette Avenue Shop, milk was stored in uncovered containers; sugar was kept in a filthy container; an employee's water bottle was in the ice machine in direct contact with ice used to serve customers; and liquid was stored in unmarked bottles.

**5.** At the West Main Street Shop, food products were not dated; the ice scoop was stored in the ice machine; and the sanitizer was at an inadequate level of concentration.

*there were no conditions that did not comply."* [6] (emphasis added).

Mr. James claims that (1) Dunkin's temperature measurements were done without proper thermometer calibration and are therefore "inclusive and unreliable"; (2) Dunkin's detection of mouse feces was "inconclusive" because Dunkin's inspectors relied only upon visual observation and did not use a black light to identify mouse urine; [7] (3) Dunkin's "standards . . . evidence a lack of understanding of the state requirements and food safety issues" regarding proper temperature storage of cream cheese; (4) Dunkin's requirement that thermometers be sanitized in solution before using is contrary to New Jersey law; and, (5) when he inspected the shops in question, the trash container lids were in place. Mr. James does not address the other health and safety violations found by Dunkin's inspectors.

In his Certification submitted with Defendants' opposition papers, Defendant Dipak R. Patel ("Patel") asserts that he was told by another franchisee prior to the April inspections that the franchisee was told he should approach Defendant to purchase all his locations because "Dunkin' was going to 'force Dipak out.' " Defendant Patel also asserts that at about the same time, he was told "from another source that Dunkin' had decided to put us on an 'exit strategy.' " Defendant Patel contends that Dunkin' is engaging in unfair tactics to economically retaliate for his "failure to support a franchisee owned co-operative off-premises bakery."

Defendants assert that questions of fact do exist as to (1) the accuracy of the inspections that provided the basis for Plaintiff's actions; (2) the "unfair and harassing inspection procedures employed"; and, (3) whether the inspections and the motion for summary judgment were brought in bad faith with the intent to interfere with Defendants' contractual rights and protections afforded franchisees under the New Jersey Franchise Practice Act, N.J.S.A. 56:10–1, et seq.[8]

In its reply to Defendants' opposition papers, Plaintiff argues that Mr. James is not competent to testify as to the conditions of the three shops during the time of Plaintiff's inspections since, as he admits, he was not present during any of those inspections. Plaintiff argues also that Mr. James' Certification is flawed in that it addresses whether Defendants' shops were in compliance with New Jersey's health regulations. However, Plaintiff asserts that it is permitted to set stricter standards of health and safety than those of the State. Plaintiff further contends that Mr. James fails to refute the substantial photographic and other evidence supporting Plaintiff's Motion for Summary Judgment, which evidence "demonstrates incontrovertibly that Defendants' shops were not in compliance with Dunkin's standards in April 2000."

*Motion to Strike Certification
and Memorandum of
William James*

Plaintiff has also filed a Motion to Strike the Certification and Memorandum of Wil-

---

6. Mr. James' inspections were done of all three shops on June 23, 2000. He also inspected the Lafayette Avenue Shop again on June 26, 2000.

7. Mr. James certifies that a "black light is a basic and standard field test instrument utilized by professional food safety inspectors."

8. Defendants do not elaborate as to what these protections are in their opposing brief. In fact, other than citing some common case law on the summary judgment standard, Defendants cite no other law or other authority in any of its opposition papers to support its position.

liam James, which documents were submitted by Defendants in their opposition papers to the summary judgment motion. Plaintiff's basis for this motion is that the Defendants did not comply with the disclosure requirements of Federal Rule of Civil Procedure 26(a)(2)(B), and that neither document satisfies the requirements of Federal Rule of Evidence 702 that expert testimony be based upon "sufficient facts and data" and helpful to the trier of fact.

The Scheduling Order entered in this action required Defendants to serve Plaintiff with copies of their expert reports by January 31, 2001. Defendants did not do so. Discovery closed on February 28, 2001. The Scheduling Order also specified that expert reports "shall contain the information required by Federal Rule of Civil Procedure 26(a)(2)(B)." Although Defendants did attach Mr. James' June 26, 2000 memorandum to their July 5, 2000 brief in opposition to Plaintiff's Motion for a Preliminary Injunction,[9] Plaintiff alleges that the memorandum did not comply with the requirements of Federal Rule of Civil Procedure 26(a)(2)(B) or with Federal Rule of Evidence 702.

### *Applicable Law*

#### *The Summary Judgment Standard*

"A party against whom a claim . . . is asserted . . . may, at any time, move with or without supporting affidavits for a summary judgment in the party's favor as to all or any part thereof." Fed.R.Civ.P. 56(b). The Rule also sets forth the standard for granting such a motion, stating that the motion for summary judgment shall be granted if

the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed. R. Civ. Pro. 56(c).

Basically, the Rule directs the Court to decide, after reviewing the pleadings, affidavits, depositions, documents, and interrogatory answers put forth by both parties, whether a reasonable jury, applying relevant law, could return a verdict in the nonmoving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–52, 254, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If the answer to that inquiry is no, then the motion for summary judgment must be granted. *Id.*

It is important to note, though, that if there is a dispute over facts that do not go to the substantive law at issue, the facts are not "material" under the Rule. In other words, disputes over facts that are irrelevant or unnecessary to proving the case will not defeat a motion for summary judgment. *Id.* at 248, 106 S.Ct. 2505. Additionally, when analyzing and drawing inferences from the facts presented, the Court must resolve those inferences in favor of the non-moving party. *Luden's, Inc. v. Local Union No. 6 of Bakery, Confectionery & Tobacco Workers' Int'l Union of America*, 28 F.3d 347, 353 (3d Cir.1994).

Th Rule also states that when a motion for summary judgment is made and properly supported, the party against whom the summary judgment is sought

may not rest upon the mere allegations or denials of [that party's] pleading, but [that party's] response, by affidavits . . . must set forth specific facts showing that there is a genuine issue for trial. If

9. That motion was withdrawn by Plaintiff on August 6, 2000, since by that time Defendants had cured the violations.

the adverse party does not so respond, summary judgment if appropriate, shall be entered against the adverse party. Fed.R.Civ.P. 56(e).

The Courts have clarified this portion of the Rule by stating that the burden of proof for a summary judgment motion shifts during the motion process. First, the moving party bears the burden of showing that, according to the pleadings and discovery materials presented, summary judgment is appropriate under Rule 56. *Celotex Corp. v. Catrett,* 477 U.S. 317, 330, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The burden then shifts to the non-moving party to show, by affidavit or otherwise, that a genuine issue of material facts remains. *Id.* Courts have noted, however, that it is not the Court's obligation to sift through the record searching for a genuine issue of material fact. Rather, it is the parties' obligation to show the absence or existence of such an issue. *See, e.g., Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner,* 101 F.3d 145, 154 (D.C.Cir.1996).

Moreover, a party does not raise a genuine issue of material fact by speculation and conclusory allegations. *Trap Rock Indus. v. Local 825, Int'l Union of Operating Eng'rs,* 982 F.2d 884, 890 (3d Cir.1992) (stating that the non-moving party "may not rest upon mere allegations, general denials, or . . . vague statements") (omission in original); *Sterling Nat'l Mortgage Co. v. Mortgage Corner, Inc.,* 97 F.3d 39, 45 (3d Cir.1996) (holding that the plaintiff was obliged to come forward with evidence sufficient to raise a triable issue and that "[m]ere speculation about the possibility of the existence of such facts" did not suffice).

### The Breach of Contract Issue

The terms of a Franchise Agreement, like the terms of any contract, govern any dispute that arises regarding the contract or its application.

 A court "can grant summary judgment on an issue of contract interpretation if the contractual language being interpreted is subject to only one reasonable interpretation." *Emerson Radio Corp. v. Orion Sales, Inc.,* 253 F.3d 159, 164–65 (3d Cir.2001) (internal quotation marks omitted). "Where . . . a contract is unambiguous, it is appropriate for the court to determine its meaning as a matter of law at the summary judgment stage." *LeJeune v. Bliss–Salem, Inc.,* 85 F.3d 1069, 1073 (3d Cir.1996). If a contract can reasonably be interpreted in two different ways, then a contracting party is not entitled to summary judgment in breach of contract action. *American Flint Glass Workers Union v. Beaumont Glass Co.,* 62 F.3d 574, 581 (3d Cir.1995).

 Further, in *Dunkin' Donuts Inc. v. Priya Enter., Inc.,* 89 F.Supp.2d 319 (E.D.N.Y.2000), a case similar to the one at bar, the court held that a Dunkin' Donuts' franchisee's failure to cure violations of Dunkin' Donuts' standards for health, sanitation, and safety after notice and an opportunity to cure was a breach of the franchise agreement. *Id.* at 322. The court held that "Dunkin' Donuts . . . established that, under the clear language of the franchise agreement, it is entitled to a judgment for the attorney's fees it has expended pursuing this case." *Id.* at 322.

 Moreover, a franchiser is free to establish health, sanitation, and safety standards that exceed those of the municipality in which the franchised store is located. *See, e.g., Baskin–Robbins, Inc. v. A. Ender, Ltd.,* No. CV–N–99–206–ECR, 1999 WL 1318498, at *3 (D.Nev. Sept.10, 1999) (holding that the franchiser's health standards were higher than those of the county health department in which the

store was located and recognizing that the franchiser was "entitled, under its contracts, to insist on stricter standards," especially given that it did business on a national scale).

### Certification and Memorandum of William James

Fed.R.Civ.P. 26(a)(2), subtitled, "Disclosure of Expert Testimony," states, in pertinent part, that

> (B) Except as otherwise stipulated or directed by the court, this disclosure shall, with respect to a witness who is retained or specially employed to provide expert testimony in the case ... be accompanied by a written report prepared and signed by the witness. The report shall contain a complete statement of all opinions to be expressed and the basis and reasons therefor; the data or other information considered by the witness in forming the opinions; any exhibits to be used as a summary of or support for the opinions; the qualifications of the witness, including a list of all publications authorized by the witness within the preceding ten years; the compensation to be paid for the study and testimony; and a listing of any other cases in which the witness has testified as an expert at trial or by deposition within the preceding four years.

Fed.R.Civ.P. 26(a)(2)(B).

 "The test of a report is whether it [is] sufficiently complete, detailed and in compliance with the Rules so that surprise is eliminated, unnecessary depositions are avoided, and costs are reduced." *Reed v. Binder,* 165 F.R.D. 424, 429 (D.N.J.1996). An expert report under Rule 26 "is intended to set forth the substance of the direct examination of the expert witness," and must "disclose the data and other information considered by the expert." Advisory Committee Notes to the 1993 Amendments to Rule 26. To satisfy the Rule, "the report must provide the substantive rationale in detail with respect to the basis and reasons for the proffered opinions. It must explain factually why and how the witness has reached them." *Hilt v. SFC, Inc.,* 170 F.R.D. 182, 185 (D.Kan.1997). "[T]he purpose of the reports is to avoid the disclosure of 'sketchy and vague' expert information." *Sierra Club v. Cedar Point Oil Co.,* 73 F.3d 546, 571 (5th Cir.1996).

 Furthermore, if an expert witness does not have information concerning previous cases in which he or she testified or was deposed, that should be revealed. *Hilt,* 170 F.R.D. at 185.

> Fed.R.Evid. 702 states:

> If scientific, technical or other specialized knowledge will assist the trier of fact to under the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

### *Analysis*

#### *Summary Judgment Motion*

Plaintiff asserts that no genuine issue of material fact exists since Defendants breached their Franchise Agreements by failing to maintain the Hamilton Street Shop, Lafayette Avenue Shop, and West Main Street Shop in compliance with Plaintiff's standards for health, sanitation and safety as set forth in the Franchise Agreements and Manuals. Plaintiff further asserts that the Franchise Agreements expressly require that Defendants pay Plaintiff's attorneys' fees and costs

incurred as a result of Defendants' breach and their failure to cure the violations timely.

As stated, under the Franchise Agreements, Defendants are required to maintain their shops in compliance with Plaintiff's standards, including those standards for health, sanitation and safety. If violations of standards are observed, Defendants are entitled to written notice and twenty-four hours to cure the violations, as stated in the Franchise Agreements. If the violations are not cured after the cure period expires, then Defendants are in breach of the Franchise Agreements.

In this case, Dunkin' representatives inspected Defendants' shops and observed numerous standards violations. While some of these violations have been disputed by the Defendants in their opposition papers,[10] many have not. Although · the Defendants cured these violations as of August, 2000, Plaintiff alleges they refused to pay the attorneys' fees and costs Plaintiff has incurred, and continues to incur, in instituting and prosecuting this action. The Franchise Agreements expressly provide that if the franchisee fails to cure a default, following the appropriate notice and within the applicable time period, then the franchisee is to pay the attorneys' fees, costs, and expenses incurred by Dunkin' as a result of the failure to cure.

■ As far as Defendants' assertions that they are being unfairly targeted by Dunkin' in retaliation for their refusal to support an off-premises bakery, these assertions are based upon hearsay and speculation. Out-of-court statements offered

for the truth of the matter asserted are "presumptively inadmissible" hearsay. *United States v. Saada*, 212 F.3d 210, 221 n. 12 (3d Cir.2000). Genuine issues of material fact cannot be raised by speculation and conclusory allegations. *Trap Rock Indus.*, 982 F.2d at 890.

■ Further, Defendants' claim that Dunkin' inspections were retaliation for Defendants' refusal to support a franchisee-owned cooperative off-premises bakery was previously addressed by this Court when it dismissed Defendants' Counterclaim with prejudice in March, 2001.[11] In addition, Dunkin's motives in conducting its inspections have no bearing on whether Defendants' breached their Franchise Agreement with Plaintiff by failing to properly maintain the three shops. Other federal courts have addressed and rejected this argument. *See, e.g., McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1309 (11th Cir.1998) (rejecting the franchisee's argument that McDonald's termination of the franchise agreement for health and safety violations was merely an excuse for McDonald's real motive to relocate the store and declaring that "[e]ven assuming, *arguendo*, that this allegation is correct . . ., we find that the Robertsons' failure to comply with McDonald's QSC and food safety standards constituted a material breach of the franchise agreement sufficient to justify termination, and thus, it does not matter whether McDonald's also possessed an ulterior, or improper motive for terminating the . . . franchise agreement"); *Major Oldsmobile, Inc. v. Gen. Motors Corp.*, No. 93 Civ. 2189, 1995 WL 326475, 1995 U.S. Dist. LEXIS 7418, at

10. Even if I were not recommending that the Certification and Memorandum of William James be stricken, many of the violations found by Dunkin' representatives were not even disputed by Mr. James.

11. Defendants' Counterclaim had alleged that Dunkin's inspections "were biased, unfair, unobjective and conducted for purposes of economic retaliation because of Defendants' unwillingness to recommend to other franchisees the implementation of a cooperative off premises bakery facility . . . ."

*26–27 (S.D.N.Y. May 31, 1995) (defendant's alleged ulterior motive in terminating contract was "legally irrelevant" where it also had valid grounds for the termination), *aff'd*, 101 F.3d 684 (2d Cir.1996); *but see Gen. Motors Corp. v. New A.C. Chevrolet, Inc.*, 263 F.3d 296, 319 (3d Cir. 2001) (stating that while *Major Oldsmobile* states the correct rule regarding private contracts, the New Jersey Franchise Practices Act, N.J.S.A. 56:10–1, et seq., requires a franchiser terminate a franchise agreement with good cause, but that "New Jersey law offers no clear answer" on whether good cause requires an inquiry into whether the franchiser acted in good faith and without a "pretextual motive," and declaring that this argument was irrelevant anyway since the defendant "failed to furnish record evidence sufficient to create a genuine issue as to whether GM acted in good faith").

### Certification and Memorandum of William James

■ Both Mr. James' Certification and the Memorandum of June 26, 2000, fail to comply with Rule 26(a)(2)(B) in numerous ways. First, neither document sets forth the basis and reasons for the opinions contained therein. Mr. James' opinion that Dunkin' representatives did not properly calibrate their thermometers is based upon observations made by "[f]ranchise management and employees." Similarly, Dunkin's representative's identification of mouse feces is based upon what Defendants' employees reported to be only visual observations of feces. Second, neither of Mr. James' documents includes a list of all publications authored by him over the past ten years; they do not indicate his compensation for his study and/or testimony; nor do they list any other cases in which he has testified as an expert or by deposition within the past four years.

Further, the June 26, 2000 Memorandum lacks Mr. James' signature.

■ Furthermore, the documents are not admissible under Federal Rule of Evidence 702, which governs the admission of expert testimony. The two documents, both of which challenge the validity of Dunkin's inspections, are not "based upon sufficient facts and data" as required by the Rule, because Mr. James has not demonstrated knowledge of Dunkin's health, sanitation, and safety standards. His Certification and Memorandum focus on whether Defendants' shops were in compliance with the requirements of New Jersey law. However, the issue is whether Defendants' shops met Plaintiff's standards. Moreover, as Mr. James acknowledges, not only was he not present during Dunkin's inspections, he states that "[b]ased on a review of the reports, it could not be shown that they [the three shops] were not operating property [sic], but I was not there at that time and cannot say that there were no conditions that did not comply."

Moreover, Mr. James' opinions in his Certification and Memorandum are not supported by any treatises or authoritative documents in which standard practices are set forth for thermometer calibrations, determining internal food temperatures, or that black lights must be used to accurately determine the existence of mouse feces. Mr. James simply states in his Certification that he is "fully familar [sic] with all form [sic] of food handling sanitation methodologies and techniques and have set forth a full listing of my health inspection credentials." Similarly, Mr. James states in his Memorandum of June 26, 2000, that in his "professional opinion" the shops in question "are operating in compliance with New Jersey Law ... and [their] operations are conducted in accordance *with what is considered to be good public health*

*and food safety standards.*" (emphasis added).

Additionally, although Mr. James does attach a resume to his Certification listing his health inspector credentials and employment history, the other requirements of Rule 26(a)(2)(B) are not met: there are no exhibits identified "to be used as a summary of or support for the opinions"; there is no list of publications authorized by Mr. James within the preceding ten years; there is no mention of the compensation paid to Mr. James for his study and testimony; and there is no list of any other cases in which Mr. James testified as an expert within the preceding four years.

Since discovery closed on February 28, 2001, and given that Defendants never designated Mr. James an expert, Plaintiff does not now have an opportunity to learn the factual bases for the opinions contained in Mr. James' Certification and June 26, 2000 Memorandum. In addition, information concerning Mr. James' compensation for his study and testimony is relevant regarding bias. Further, a listing of previous cases in which Mr. James has testified as an expert would allow Plaintiff to locate that testimony since it might be relevant to this case.

Mr. James' Certification and Memorandum also do not meet the requirements of Federal Rule of Evidence 702 because they are not based upon "sufficient facts or data" in that they fail to establish that Mr. James has any familiarity with Plaintiff's health, sanitation, and safety standards. Instead, both documents focus on whether Defendants' shops were in compliance with the New Jersey State Health Code. However, the issue is whether Defendants' shops met Plaintiff's standards.

Defendants, in their opposition papers to the Motion to Strike, argue that this motion is both "substantively illogical and procedurally defective." Defendants argue that the motion is "substantively illogical" because it was not possible for Mr. James to be present during Plaintiff's April 2000 inspections of the shops. However, the central issue in this case is whether Defendants' shops met Dunkin's standards. Indeed, instead of addressing Plaintiff's arguments that Mr. James' Certification and Memorandum do not meet the requirements of Federal Rule of Civil Procedure 26(a)(2)(B) and Federal Rule of Evidence 702, their opposition papers merely reiterate Mr. James' findings, which had been set forth in their opposition papers to the summary judgment motion.

Lastly, Defendants' claim that the Motion to Strike is procedurally defective in that Plaintiff cannot "piggy-back" it onto its original Motion for Summary Judgment. Defendants assert that "[i]nstead of sending its motion [sic] Defendants' counsel as a new and separate motion, Plaintiff chose to treat the motion in the nature of a reply, which it cannot do as the subject of the motion is totally different from its original summary judgment motion." However, it is this argument that is illogical and unsupported.

### CONCLUSION

For the foregoing reasons, I recommend that Plaintiff's Motion for Summary Judgment on Counts I, II, and III and its Motion to Strike the Certification and Memorandum of William James be granted.

Sept. 18, 2001.